1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

4    E. I. DUPONT de NEMOURS &    :    CA NO. 14-1250-RGA

5    COMPANY,                     :

6                                 :    April 28, 2017

7              Plaintiff,         :

8                                 :    8:32 o'clock a.m.

9         v                       :

10                                :

11   UNIFRAX I LLC,               :

12                                :

13             Defendant,         :

14   ..............................:

15

16

17          TRANSCRIPT OF PRETRIAL CONFERENCE

18      BEFORE THE HONORABLE RICHARD G. ANDREWS

19          UNITED STATES DISTRICT JUDGE

20

21

22   APPEARANCES:

23

24   For Plaintiff:     POTTER, ANDERSON & CORROON

25                      BY:  BINDU A. PALAPURA, ESQ

```
 1                                    -and-

 2                         BARTLIT BECK HERMAN PALENCHAR & SCOTT

 3                         BY:  CHRISTOPHER D. LANDGRAFF, ESQ

 4                         BY:  MARK L. LEVINE, ESQ

 5                         BY:  CHRISTOPHER R. HAGALE, ESQ

 6                         BY:  SHARON DESH, ESQ

 7

 8   Other Appearances:   THOMAS A. STEVENS, ESQ

 9                         In-House Counsel for DuPont

10

11   For Defendant:       RICHARDS, LAYTON & FINGER

12                         BY:  FREDERICK L. COTTELLL, III, ESQ

13                                    -and-

14                         ROBINS KAPLAN LLP

15                         BY:  JAKE M. HOLDREITH, ESQ

16                         BY:  DAVID A. PRANGE, ESQ

17                         BY:  ALYSSA N. LAWSON, ESQ

18                         BY:  EMILY E. NILES, ESQ

19                         BY:  GEORGE ASHENMACHER, ESQ

20

21

22

23   Court Reporter:         LEONARD A. DIBBS

24                           Official Court Reporter

25
```

1                    P R O C E E D I N G S

2

3              (The proceedings occurred at 8:32 o'clock a.m. as

4     follows:)

:32:44    5              THE COURT:  Good morning, everyone.  Please be seated.

6              This is the pretrial conference in DuPont v. Unifrax.

7              Ms. Palapura?

8              MS. PALAPURA:  Good morning, your Honor.

9              Bindu Palapura from Potter Anderson on behalf of

:33:03   10    DuPont.

11             With me today from Bartlit-Beck, Chris Landgraff.

12             MR. LANDGRAFF:  Good morning, your Honor.

13             MS. PALAPURA:  Mark Levine.

14             MR. LEVINE:  Good morning, your Honor.

15             MS. PALAPURA:  Chris Hagale.

16             MR. HAGALE:  Good morning, your Honor.

17             MS. PALAPURA:  Sharon Desh.

18             MS. DESH:  Good morning, your Honor.

19             MS. PALAPURA:  Tom Steven from Dupont.

:33:10   20             MR. STEVENS:  Good morning, your Honor.

21             THE COURT:  Good morning to you all.

22             Mr. Cottrell?

23             MR. COTTRELL:  Good morning, your Honor.

24             Fred Cottrell from Richards Layton for defendant

:33:25   25    Unifrax.

1       I think you know most of the folks from Robins Kaplan.

2       We have first Jake Holdreith.

3       MR. HOLDREITH:  Good morning, your Honor.

4       MR. COTTRELL:  David Prange.

:33:33   5       MR. PRANGE:  Good morning, your Honor.

6       MR. COTTRELL:  Alyssa Lawson.

7       MS. LAWSON:  Good morning, your Honor.

8       MR. COTTRELL:  Emily Niles.

9       MS. NILES:  Good morning, your Honor.

10      MR. COTTRELL:  George Ashenmacher.

11      MR. ASHENMACHER:  Good morning, your Honor.

12      THE COURT:  Thank you, Mr. Cottrell.

13      I will say hello to Mr. Poff.  I don't know whether

14      you're here for Lamart Corporation, or whether you're here just

:33:53   15      as an observer, or whether when we start talking about

16      confidentiality, you have something that you want to say?

17      MR. POFF:  Good morning, your Honor.

18      Yes, we do.

19      I'm here with Jeffrey LaRosa from Schenck, Price, Smith

:34:00   20      & King.

21      And, yes, we represent the Lamart Corporation.  We

22      would just like to be heard on confidentiality.

23      THE COURT:  Okay.  All right.

24      Thank you.

:34:10   25      Mr. Poff.  It's good to see all of you.

1          So I have been through most of the Pretrial Order.

2          Of course, I'm prepared to go through it, just before I

3      do, is there anything that's happened since this was submitted

4      that takes away issues or anything else that I should know

:34:34    5      about?

6                   MR. HOLDREITH:  Your Honor, we're continuing to confer

7      on the juror notebooks --

8                   THE COURT:  Okay.

9                   MR. HOLDREITH:  -- and continuing to confer on the

:34:42   10      final jury instructions and verdict form, but I think other than

11      that, we are ready to address all the issues in the Pretrial

12      Order.

13                   THE COURT:  Okay.

14                   MR. LANDGRAFF:  That's right.

:34:53   15                   MR. HOLDREITH:  Your Honor, if I may make a comment?

16                   If the Court wants to address Mr. LaRosa's

17      confidentiality concern out of turn so he can go home, we have

18      no objection to that.  Obviously, we'll proceed as the Court

19      desires.

:35:06   20                   THE COURT:  That's a reasonable suggestion.

21                   If, in fact, Mr. Poff and Mr. LaRosa plan on leaving as

22      soon as this is done or are they going to stay here anyhow?

23                   MR. POFF:  We'll probably leave, your Honor.

24                   THE COURT:  All right.

:35:21   25                   I assume, Mr. LaRosa, I think you've seen what I take

|  | |
|---|---|
| 1 | to be the disputed portion, which is near the end of the -- |
| 2 | well, maybe you haven't,since this is probably filed under seal. |
| 3 | But, in any event, why don't you just tell me what you |
| 4 | would like to tell me. |
| 5 | MR. LAROSA:  Thank you, your Honor. |
| 6 | I have not seen the Pretrial Order.  Both parties have |
| 7 | given me a list of documents that they intend to use at trial, |
| 8 | Lamart documents that we produced in response to a subpoena that |
| 9 | we marked as highly confidential. |
| 10 | Those are trade secret level documents from my clients, |
| 11 | so we wanted to come here this morning and ask your Honor what |
| 12 | we can do to insure the secrecy of those documents in terms of |
| 13 | sealing the courtroom, sealing the courtroom during the |
| 14 | testimony of Chad Garvey, who is a Lamart employee, and also |
| 15 | sealing the courtroom when our documents are being introduced. |
| 16 | I don't know if that will be through Mr. Garvey, through other |
| 17 | witnesses, I am not privy to any of those issues. |
| 18 | I suppose what would help is, if counsel advises your |
| 19 | Honor when those documents are growing to be introduced. |
| 20 | THE COURT:  How many documents do you think you're |
| 21 | talking about, or do you really not know? |
| 22 | MR. LAROSA:  I think it's possibly in the 30 range.  I |
| 23 | don't quite know. |
| 24 | THE COURT:  This has to do with how the laminate is |
| 25 | made or how Insulfab is made? |

Timestamps (left margin):
:35:40 (line 5)
:35:54 (line 10)
:36:12 (line 15)
:36:27 (line 20)
:36:40 (line 25)

```
  1           MR. LAROSA:  Our step in the process of how the

  2   lamination occurs, what adhesives are used, what the process is,

  3   more generally, those are all things that implicate my client

  4   not only for this product, but for the other products that my

  5   client makes.

  6           So it's a significant concern to my client.

  7           THE COURT:  Okay.

  8           Let's just assume -- and this is a big assumption that

  9   I might actually do something about this -- but let's assume

 10   that I would do something about this, how would you suggest that

 11   it be implemented, or are you planning on being here every day

 12   of the trial?

 13           MR. LAROSA:  I had not planned on being here every day.

 14   I had planned on being here when Mr. Garvey testifies, so I will

 15   be here for that.

 16           I mean, whether you want -- your Honor wants to hear

 17   from me during that, I just simply don't know when the parties

 18   will use our documents with other witnesses.

 19           That's why I'm not privy to anyone's trial strategy.  I

 20   think that's why I said, you know, perhaps it would be helpful

 21   if counsel can --

 22           THE COURT:  I take it that there's some reasonable

 23   chance that your documents will be used with expert technical

 24   witnesses?

 25           MR. LAROSA:  I suspect.
```

:36:54

:37:11

:37:28

:37:40

:37:49

1          THE COURT:  All right.

2          I'm sorry.  You said up to 30 documents.

3          I take it the parties know essentially what you're

4     talking about, because whatever it is, is marked highly

:38:17     5     confidential in the discovery that they are now planning to use,

6     so --

7          MR. LAROSA:  Right.

8          THE COURT:  -- the two of you talked to each other

9     without necessarily talking to each other.

:38:25    10          MR. LAROSA:  Right.  What happened is, probably a year

11     ago, I produced probably somewhere in the range of a thousand

12     documents.  I'm not sure.  We marked some confidential and some

13     highly confidential.

14          Recently, meaning as recently as yesterday, the parties

:38:36    15     had told me what documents of ours they intend to use, and I

16     think it's a sum total of 30, 35 documents.

17          I don't know if they are going to use them or not, but

18     both parties wrote me letters saying, here's your documents.

19     And I think of them, I think they were all highly confidential

:38:50    20     documents.

21          Like I said, I --

22          THE COURT:  And the reason why they would be

23     introducing these, or it's probably not your question to answer,

24     the reason why your documents would be of relevance would be to

:39:03    25     infringement?

1          MR. LAROSA:  I'm the least capable person in this room

2    to answer that question, your Honor.

3          MR. LEVINE:  The answer, your Honor -- this is Mark

4    Levine for DuPont -- the answer is yes.

:39:13    5          So Lamart works with Unifrax on lamination of 3G11, the

6    accused products.

7          THE COURT:  And, so, the thing that's being accused

8    here is a product, right?  It's not a process, or method, or

9    something?

:39:29   10          MR. LEVINE:  Correct, your Honor.

11          THE COURT:  And, so -- so...

12          MR. LAROSA:  Perhaps I could explain, your Honor.

13          My client is -- my client is Lamart.  They laminate

14    things.  And when you laminate something there is question of

:39:47   15    the adhesive they use, the process you use, the heat you use,

16    the time, the speeds.  Those kind of things.

17          That's my client's business.  And if Unifrax knows a

18    little of it, DuPont, I think, knows very little of it.  The

19    rest of the world hopefully knows none of that.

:40:05   20          And the documents that the parties intend to use I

21    assume are relevant to the case.  That's not really my decision

22    to make.

23          But in that they have information about my client's

24    processes as to this particular product, but as to all the

:40:16   25    products they make.

1    So, if one were to see every piece of paper that the

2  two parties are looking to submit to the Court as evidence, one

3  could kind of backtrack into understanding my client's

4  operations and what they do, not for this product, but for

:40:30    5  everything they do.

6    And, again, as I said, that is a significant concern to

7  my client.  Obviously, the parties are here to litigate an

8  issue, they should have access to it.

9    THE COURT:  All right.

:40:45    10    So why don't I -- how many -- let me ask the lawyers

11  that are trying this case.

12    How many of these 30 documents is actually necessary to

13  introduce for infringement purposes?  I mean, is there some

14  dispute as to how Lamart does whatever it is that it does?

:41:18    15    I mean, it seems like an awful lot of documents just in

16  the abstract matter regarding a trade secrets issue.

17    MR. LEVINE:  Your Honor, in terms of the numbers, there

18  are 30 documents on DuPont's exhibit list that were produced by

19  Lamart that were marked as confidential or highly confidential.

:41:36    20  I don't know how many were on Unifrax's list.

21    A number of those relate -- we're not using it for the

22  manufacturing process, because that's not at issue.  One of the

23  things that counsel mentioned was the adhesive that's used, one

24  of the layers that's in the patent.  One of the three layers is

:41:53    25  the adhesive layer.

1          So, obviously, we need to get out that there's actually

2    two adhesive layers that are used, and what the composition is

3    in those adhesive layers in the critical areas.

4          THE COURT:  The composition of the adhesive layer is

:42:08   5    probably a trade secret?

6          MR. LAROSA:  Right.  That's something we keep very

7    confidential.  We notified both parties.  I think the names of

8    those adhesives is probably a significant issue in this case.

9          I don't know if during the process of the case they can

:42:21   10   refer to the adhesives by code names or whatever.

11         THE COURT:  Well, the problem is, Mr. LaRosa, or part

12   of the problem is, it's not as though they are trying the case

13   to me.  They are trying the case to the jury.

14         So you than can't have a secret signaling system, I

:42:38   15   don't think.  You could have -- you could probably have it with

16   me, but --

17         MR. LEVINE:  Your Honor, if I may interrupt?

18         These are two adhesives.  They are both off-the-shelf

19   adhesives made by other companies and then used by Lamart.

:42:50   20         The names we'd be using aren't code names.  They are

21   names in product sheets.  The things that are sold by other

22   companies that Lamart uses.

23         MR. LAROSA:  There are many things made by other

24   companies.  It's the fact that we use them in this process that

:43:09   25   is significant.

1    THE COURT:  All right.

2    Well, I guess all I can say, Mr. LaRosa is, what I

3    would normally do for things like this are, we don't put things

4    on --  you know, my courtroom has gone high-tech since the last

:43:51   5    time I did this -- but we used not to put things on the big

6    screen and just put things on the screen that the jury can see.

7    In other words, I don't know that you can do anymore.

8    And, so, you know, I'm not a big fan of closing the

9    courtroom.

:44:14   10    And sometimes -- you know, it's just hard for me --

11    it's hard for me to actually know exactly what we're talking

12    about.

13    These 30 documents, are these one or two pages long

14    each, or are these technical manuals, or what are they?

:44:37   15    MR. LAROSA:  I think the sum total is probably an inch

16    thick.  Something like that.

17    MR. LEVINE:  It's sound about right.  I haven't looked.

18    I haven't added it up.  It's not a huge quantity.

19    And, your Honor, as you know, because the exhibit lists

:44:53   20    for both sides are several hundred documents, it's doubtful that

21    we will use all 30.  I'm sure we'll use at least a fraction of

22    that, but it's hard to say right now which ones they'll be.

23    THE COURT:  All right.

24    MR. LAROSA:  If there's an appropriate time that

:45:07   25    counsel could redact the documents, it sounds like the names of

1    the adhesives is an issue, obviously in this case, perhaps

2    there's a lot more on those pages that is of concern to me that

3    may be irrelevant to counsel.

4            THE COURT:  Well, so, one thing is, it's hard for me to

:45:27    5    believe that an inch of your documents -- and I understood Mr.

6    Levine just saying, yeah, that's right.

7            It's hard for me to believe that an inch of your

8    documents would be needed to prove that the products -- I guess

9    actually what Unifrax makes is the infringing product.

:45:54    10    So, you know, the first thing to do is to get the

11    lawyers to show -- I mean, I'm trying to work with both sides to

12    try to get some restraint on what they actually want to use.

13            And I guess what I would say is, you know, I think the

14    parties need to come up with some way to present these documents

:46:26    15    to the jury that don't involve using the big screen.  And, you

16    know, there are a lot of documents -- I forget whether these are

17    the Delaware counsel that were involved last time -- the last

18    time -- actually, the last jury trial I had both sides were

19    wholesale admitting documents for no good reason at all, and

:46:57    20    they complained later that too much information went public.

21            I understand here probably you don't actually have

22    control over that, because you're not in the case.

23            But, in any event, I would say get something to the

24    jury so they could be shown.  Work with the parties and whenever

:47:15    25    this Mr. Garvey is going to be testifying, maybe you can before

1       the expert testifies -- I guess in a way what I would say is,

2       sometimes these things are not really in dispute.

3              I mean, some obviously are, but I don't know whether

4       the parties are stipulating to anything in regards to what

:47:46    5   elements Unifrax's product does meet, so that maybe, you know

6       not all of them, so that really you just concentrate on the ones

7       that are in dispute, and which ones you can cut down the number

8       of documents.

9              Other than that, I don't want to close the courtroom.

:48:10   10   I would prefer that the experts at least -- I don't know if Mr.

11      Garvey -- but the experts at least can help counsel not talk

12      about things that are not necessary to talk about.

13             That's about as much as I can do for you right now.

14             MR. LAROSA:  Judge, I'm willing to work with both

:48:35   15   parties to take the documents and redact them or narrow them

16      down.

17             THE COURT:  Yeah, I mean, if there -- you know, I'm not

18      opposed to having documents redacted, and, you know, give the

19      jury some explanation as to why things are redacted, otherwise

:48:59   20   they'll wonder.

21             So, if you can make progress on it, that's fine.

22      Otherwise, it's a good thing with whenever it is going to be an

23      issue for lawyers to talk to me about it, you know what I mean,

24      so I will have a better sense then what's going on?

:49:20   25             MR. LAROSA:  I take it your Honor is disinclined to

1    close the courtroom during Mr. Garvey's testimony?

2            THE COURT:  I am.

3            MR. LEVINE:  Your Honor, if I could just address one

4    thing, if that's all right?

5            THE COURT:  Yes.

6            MR. LEVINE:  We'll certainly work with counsel and try

7    to limit what we use, and we'll talk about what can be redacted.

8            As you know, for the two adhesives that are used, and

9    what the composition is of those adhesives, it's not in every

10   respect, but with respect to weights, and the activation, the

11   bonding temperature, which are what is talked about in the

12   claims, it's important that we should be able to put up on the

13   screen what's said on those features, because that's part of the

14   claim limitation.

15           THE COURT:  Well, you know, when you say "up on the

16   screen," it's important that you present it to the jury.  It's

17   not actually important that you put it up on a big screen.

18           MR. LEVINE:  Well, it's important that we show that

19   there's proof of what the weight is.

20           THE COURT:  Right, and that's the reason why -- I mean,

21   I'm sorry, I may have not have made this clear.

22           You know, you guys might want to come up with some

23   other screen that you bring in, and stick at the end of jury box

24   --

25           MR. LEVINE:  Sure.

1          THE COURT:  -- or something, so that the thing

2     shouldn't be on the big screen, you can present them to the jury

3     without having them on the big screen.

4          MR. LEVINE:  Got it.

:50:39    5          Like an LCD screen over here?

6          THE COURT:  Something like that.

7          All right.

8          Thank you, Mr. LaRosa.

9          MR. LAROSA:  Thank you, your Honor.

:50:53   10          All right.

11          So, Mr. Landgraff, are you now the lead counsel for

12     this case for DuPont?

13          MR. LANDGRAFF:  Yes, your Honor.

14          Mr. Levine and I will be trying it.  Adam Mortara, this

:51:10   15     is an appropriate time to tell you, his father is quite ill and

16     is receiving some new/treatment plan in the next couple of weeks

17     that conflict with the trial schedule.  He sends his regrets.

18          THE COURT:  I have noticed he seemed to drop out.

19          MR. LANDGRAFF:  Yes.  He asked me to tell you at an

:51:27   20     appropriate time.

21          THE COURT:  Okay.  Well, that was the appropriate time.

22          All right.

23          Let's just go through the Pretrial Order.  I have

24     tabbed a bunch of pages.

:51:41   25          Oh, so these are kind of disjointed, because they are

1    just in the Order in which they appear in the Pretrial Order.

2           Page 5, it references to a trial deposition of Mr.

3    Garvey.

4           I take it whatever that dispute was about is probably

:52:03   5    moot now?

6           MR. HOLDREITH:  Yes, he'll appear live.

7           THE COURT:  Okay.

8           MR. HOLDREITH:  We're happy to have that removed.

9           THE COURT:  As far as I can tell, it's resolved.

:52:15  10           MR. LEVINE:  Yes, sir.

11           THE COURT:  All right.

12           So the next page, the parties agree to give each other

13    -- the other side a list of and dispute between live witnesses

14    and all witnesses, presumably, meaning those appearing by

:52:35  15    deposition.

16           I'm kind of wondering what is DuPont's objection to all

17    witnesses?

18           MR. LEVINE:  Your Honor, the only objection is the in

19    order part.

:52:44  20           The deposition designations and the whole -- there's a

21    whole procedure in the next section at the bottom of that page.

22           THE COURT:  Oh, okay.  So here's what I think it is.

23           Yeah, I don't think it really matters in what order the

24    depositions are done in, but if you are planning on playing them

:53:00  25    on a certain day, that ought to be done.

1        MR. LEVINE:  Sure.

2        THE COURT:  You know, sometimes schedules get off, I

3    assume.

4        And, so, just because they'll call them on a certain

:53:14    5    day, if it turns out that you run a little longer, and bump

6    them, nobody is going to complain.

7        MR. LEVINE:  Right.  Sometimes you have a half an hour

8    at the end of day, you can play it then instead of calling in a

9    witness to start.

:53:26    10        THE COURT:  And that can happen, too, you know, if the

11    parties can't resolve their disputes.

12        Okay.

13        That's resolved.

14        MR. HOLDREITH:  Your Honor, may I clarify?

:53:41    15        The order that the parties should disclose that they're

16    planning to call a witness by deposition on particular day, we

17    understand the exact timing could change.

18        THE COURT:  Right.

19        In other words, the Pretrial Order says, you will tell

:53:56    20    each other which side -- who you intend to call on a particular

21    day and the order in which you would then call them.

22        The order part applies to live witnesses.  If you are

23    planning on doing depositions on that day, you should also

24    include whose people who are going to be called on that day, but

:54:13    25    obviously the order is in important.

1          MR. HOLDREITH:  I agree, your Honor.  Thank you.

2          THE COURT:  Okay.

3          So the parties requested that I order sequestration.

4          Consider it ordered.

:54:24    5          All right.

6          On Page 8, there's reference in the next to last

7    paragraph on the page to the Terflame 30 product and the 3G5.

8               That's the sanction motion that was filed by

9    DuPont recently, right, and Unifrax answered yesterday?

:54:54   10          MR. LEVINE:  Right.  It's kind of our second Motion in

11   Limine.  It was filed later.

12         THE COURT:  Right.

13         Would you like to reply to their answer?

14         MR. LEVINE:  No, we can address it orally.

:55:05   15         THE COURT:  Well, I'm not really prepared to address it

16   orally so --

17         MR. LEVINE:  Okay.

18         THE COURT:  -- do you want to reply in writing is what

19   I mean?

:55:13   20         You can say yes or no.

21         MR. LANDGRAFF:  Sure, we can have a one-page per the

22   normal procedure.

23         Can we file it at the close of business Monday?

24         THE COURT:  Yeah, that will be fine.

:55:26   25         So then there's -- the next paragraph, there's an

1    objection about Unifrax's -- and I'm quoting -- "Purported

2    written description argument," unquote.

3        I don't really understand the objection.  I see on the

4    first form that Unifrax submitted they have written description

:55:46    5    as a, invalidity argument.

6        What exactly is DuPont's objection?

7        MR. LEVINE:  Your Honor, it's that they have two

8    different written descriptions arguments, and I'm not going to

9    get into too much detail here.

:56:00    10        One of them is based on an argument that they say we

11    were making that we're not.  The other is really an

12    indefiniteness arguments.

13        But I think the -- we were just noting in the Pretrial

14    Order the place that will probably get raised is in a Motion for

:56:18    15    Judgment as a matter of law.

16        THE COURT:  Okay.  All right.

17        Well, that's fine.

18        Okay.

19        On Pages 12 and 13 or 12 mostly.

:56:30    20        Indefiniteness.

21        So, my general belief, though I'm not a hundred percent

22    sure this is right, that indefiniteness really is a question of

23    law for the Court.  And I'm not sure, honestly, what kind of

24    factual findings the jury could give that would be a underlying

:56:54    25    factual determination that they could actually make.

```
 1           So what I understand is, DuPont would like to present

 2   that separately and Unifrax -- and I'm quoting here -- "If the

 3   Court would prefer to have indefiniteness tried separately after

 4   the jury trial, Unifrax is amenable to that approach as well."

 5           That's an approach I would like to take.

 6           MR. HOLDREITH:  That's fine with us, your Honor.

 7           THE COURT:  Okay.

 8           All right.

 9           Then there's a confidentiality provision on Page 13 and

10   --

11           MR. HOLDREITH:  Your Honor, I'm sorry to interrupt you.

12           May I ask a question about the indefiniteness

13   procedure?

14           THE COURT:  Sure.

15           MR. HOLDREITH:  There are some witnesses who may have

16   testimony on indefiniteness, whether they understand the word or

17   not, that could be elicited during their regular testimony in

18   front of the jury.  It could be presented separately to the

19   Court perhaps while the jury is deliberating.

20           We don't have a strong preference either way.  We just

21   want to know what we should do on that.

22           MR. LEVINE:  We certainly don't think that the jury

23   should be hearing evidence on the subject if they are not going

24   to be deciding this.  It's going to be confusing to them.

25           THE COURT:  So I tend to think that Mr. Levine is right
```

:57:12
:57:27
:57:32
:57:48
:58:02

1       there.  And it confuses me, too, if there is some objection.

2               So, if it's the case that these witnesses, whomever

3       they are, will be hanging around when the jury is deliberating,

4       I'm perfectly happy to hear that testimony then.

:58:28      5               MR. LEVINE:  Our witness -- it depends on the schedule,

6       your Honor -- but, you know, I know that there's the case next

7       week, and there may be issues about that, as I heard from my

8       local counsel, and the other side has, too, but our expert, Dr.

9       Morgan, can be there all of next week, or all of -- not next

:58:50     10      week, but --

11              THE COURT:  The following week.

12              MR. LEVINE:  But that following Monday, he's got

13      something that he can't miss.

14              So, if we're into that following week --

:58:58     15              THE COURT:  Well, wait.  Let's just -- you all bring

16      that up before we're finished today, but let's just table that

17      for right now and see, when we'll get to how much, what the

18      schedule is going to be in that one thing.

19              All right.

:59:18     20              So I take it that, in fact, other than Mr. LaRosa and

21      Lamart, is there actually a dispute about confidentiality here

22      or is this really just as it relates to Lamart?

23              MR. LEVINE:  I think it's mostly Lamart.

24              We sent out notices.  I'm looking at my list here.

:59:43     25              We have 45 documents that were produced by third

1    parties.  30 of them were Lamart.  Eight were Orcon, which we

2    sent a notice to them, but I think a business not in operation

3    anymore.  They're winding up.  Seven were to Triumph.  We

4    haven't heard back from them.  I suspect that Lamart is going to

:00:02    5    be the biggest issue.

6        Also, they weren't produced by them, but there are also

7    a limited number of documents that are in our files, and I think

8    in Unifrax's files from Boeing.  And we just started talking to

9    them and seeing if they have an issue or not.

:00:21    10        Their initial reaction is that there is, but, again, it

11    may be one of those things where the same procedures that we

12    talked about, a separate LCD screen, amenable to them.

13        THE COURT:  Okay.

14        Do you have anything to add, Mr. Holdreith?

:00:34    15        MR. HOLDREITH:  I agree.  Boeing has informed us that

16    they would like their documents to be sealed.  I think there are

17    three in particular that were at issue.

18        We're not here to represent Boeing, but I think if we

19    confer with DuPont's attorneys and with Boeing's attorneys, we

:00:47    20    can probably use the similar procedure that the Court wants to

21    use with Lamart.  We can probably deal with that.  I would ask

22    that counsel confer on that and report back to the Court.

23        THE COURT:  Okay.

24        That works for me.

:01:01    25        All right.

1        So on the next page, Page 14, there's a disagreement

2   about witnesses and Rule 30(b)(6) designees, and maybe it would

3   be helpful for you to tell me exactly what each party wants to

4   do.

:01:32   5        In other words, DuPont, you're going to go first here.

6        Presumably, I'm guessing, you have some 30(b)(6)

7   testimony of Unifrax people that you want to play at some point?

8        MR. LEVINE:  Yes, sir, your Honor.

9        THE COURT:  And, so, is it the case that you want to

:01:53   10  play it during your case, and, you know, sort of period, or is

11  it the case -- or how do you want -- all those things being

12  equal, how do you want to present your testimony?

13       MR. LEVINE:  We want to play some of the 30(b)(6)

14  testimony during our case.  I don't know which ones yet, but

:02:14   15  I've picked out some selections.

16       And then we have other depositions, too, but they said

17  there are a number of people that are coming live.

18       Here's my real problem.

19       I don't have a problem with generally other than

:02:29   20  selected 30(b)(6) testimony, holding off on that during the

21  cross of their people.  My concern is they have eight live

22  witnesses listed --

23       THE COURT:  Well, so, I think we can address that

24  concern, because if there's an agreement that your case isn't

:02:45   25  closed until we do this testimony, and you expect to do it, as

1   they said, is on a live witness, I think what I would be

2   inclined to say is, if there's a life witness, and then it's not

3   a live witness, you get to play it then, so problem solved,

4   right?

:03:02   5   MR. LEVINE:  Yes, I think it is.  We'd probably want to

6   play, like I said, a select amount of 30(b)(6) testimony during

7   case-in-chief, so that, you know, we show -- there are certain

8   things that we need to show, and then we can hold off on the

9   individual testimony.

:03:18   10   I think it's three individual witnesses who were listed

11   that are coming live who are on the list.  And then we can hold

12   off on some of the other 30(b)(6) as well, if they are listed as

13   coming live until later.

14   THE COURT:  Is that all right with you, Mr. Holdreith,

:03:34   15   as far as DuPont goes?

16   MR. HOLDREITH:  As far as the Court said, we're

17   agreeing that DuPont can hold their case-in-chief open until all

18   of our fact witness have testified.  We're calling live all the

19   people that we want 30(b)(6) testimony from.

:03:47   20   We think if the witnesses are going to be here, they

21   should be examined live.

22   THE COURT:  So, you know, this sort of issue has come

23   up before.

24   And, so, basically, what I think I do, and I think what

:04:00   25   most judges do is to say as much possible, one would like to

1    have them all done while the witness is on the stand.

2        But I do sort of leave it to the judgment of counsel,

3    that to do an orderly presentation of your case, there's -- I

4    don't know -- a reason why you might want to play, particularly

:04:24    5    30(b)(6) testimony in your case, and, you know, maybe that

6    person -- and that person shows up later and testifies to

7    whatever else they are going to testify to.

8        So what I'm inclined to say is exactly that is, you

9    know, agree between yourselves what you're going to hold off

:04:49    10   until their witnesses are on the stand.

11       But if there are things that you think you -- you know,

12   it hurts your presentations not to play it in the first

13   go-around, then you play it during the first go-around?

14       MR. HOLDREITH:  Okay.

:05:05    15       One thing we might request in that form of presentation

16   is that if we got to it, and the witness is here live, and they

17   played the 30(b)(6), we'd like to bring them up to respond to

18   the 30(b)(6) that has been played at the time it's been played,

19   so that the jury can hear the whole story on the information

:05:22    20   that is being presented by deposition, which seems like a

21   complete way to do it.  I mean, I prefer to just hold off and do

22   it all at once.

23       THE COURT:  Well, you know, I understand, Mr.

24   Holdreith, why you make that request, but I'm not sure that

:05:39    25   that's really the -- the -- you know, I'm not really sure is --

1    you know, because presumably they play the 30(b)(6).  Then you

2    call that witness and start asking them questions in the middle

3    of their case.

4            I don't think that's the best way to get it.  I don't

:06:03    5    think that's an unreasonable request, but if they want to play

6    something in their case, they should play it and you can address

7    it in your case.

8            MR. HOLDREITH:  I will obviously abide by the Court's

9    order.  I think there's a little bit of jury confusion that is

:06:22   10    going to happen there.

11            I wonder if the other solution is, the witnesses will

12    be here, and if they want to call them live in their case and

13    reverse them, that's another possibility.

14            THE COURT:  Well, that's a possibility that the two of

:06:34   15    you can discuss.  I have no problem with that, but I have a

16    feeling that Mr. Levine does not want to do that.

17            MR. LEVINE:  Yeah, we get to decide on the rule, and

18    Rule 32(b)(3) says you can use 30(b)(6) for any purpose.

19            THE COURT:  Yeah, yeah, it was probably pointed out to

:06:50   20    me before.

21            So, Mr. Holdreith, you know, they can play some stuff

22    during their case.  Certainly the 30(b)(6) is in a better

23    position than the 30(b)(1), but I'm going to leave it up to

24    their judgment, so that's how I'm going to do this.

:07:18   25            Does Unifrax have its own 30(b)6 things or is really

1    just about DuPont?

2            MR. HOLDREITH:  This is really just about DuPont.

3            THE COURT:  So we understand each other here?

4            MR. LEVINE:  Yes, sir.

:07:28    5            May I request then that your Honor give a short

6    instruction to the jury so they understand what's happening and

7    why somebody testifies?

8            THE COURT:  Why don't you submit by the close of Monday

9    at 5:00 p.m., perhaps after the meeting and conferring, what

:07:42    10   this short instruction would be.

11           MR. HOLDREITH:  Yes, sir.  Just to tell the jury why

12   they would hear from somebody in a deposition and hear from them

13   again later.

14           THE COURT:  I haven't given such an instruction before.

:07:53    15   I don't think I've ever given such an instruction.  I'm not

16   adverse to doing it, but I would like to have something

17   concrete.

18           So why don't you all meet-and-confer and either submit

19   me two proposals or one proposal with objections, or an agreed

:08:11    20   proposal, whatever it is you want to submit.

21           MR. HOLDREITH:  Yes, sir.

22           MR. LEVINE:  And, your Honor, we've actually proposed a

23   different instruction.  It is noted in one of the objections in

24   one of the preliminary instructions.

:08:20    25           THE COURT:  Yeah, so I'm not likely to give that in the

preliminary instructions, because it's way too abstract.

You know, to me, candidly, I haven't looked at your preliminary instructions, but what I'm likely to do is pull out the preliminary instructions I gave in the last trial, and substitute in your paragraph about what this case is about and use that.

So I tend to want to give less preliminary instructions than the lawyers often ask, because I just think it's impossible for jury to absorb at that point in the case.

So when I would give an instruction is when the first such deposition is played. I usually give an instruction before the first deposition is played to say what a deposition is and counts the same as the person being live.

Maybe based on that, you can work something out why counsel is saying "live," but the person might actually be live later on, okay?

MR. LEVINE:  All right.

And just so you know, because we're telling them what's going to come, we'll want something for a 30(b)(6), just to have a short explanation of what that means, say for the corporate representative?

THE COURT:  You can go ahead submit whatever you want, okay?

MR. LEVINE:  All right.

Thank you, your Honor.

1        THE COURT:  Oh, the jury notebooks, you said you're

2    working that out, so I won't address that.

3        THE COURT:  So that's all I had in the first 17.

4        Moving ahead, we've got the witness list in Tabs 9 and

:10:09    5    10, and some of the names I recognize and some I don't.

6        For DuPont, who's Maria Boulden?

7        MR. LEVINE:  Your Honor, Maria Boulden an executive.

8    Someone at DuPont who is working in the DuPont Protection

9    Solutions area.  She's going to be our corporate representative.

:10:28    10        THE COURT:  Okay.

11        MR. LEVINE:  And during some of the relevant time frame

12    she was head of the sales team for Nomex, which is one of the

13    products relevant here.

14        THE COURT:  All right.

:10:40    15        So I know Mr. Richardson and Mr. Kawka are inventors.

16        Who is Dale Reese?

17        MR. LEVINE:  He's a sales guy.

18        MR. LANDGRAFF:  He's embedded at Boeing, your Honor.

19    He's our DuPont representative who in lives in Seattle and deals

:10:59    20    with Boeing who's the end customer for our products.

21        THE COURT:  Right.

22        So he's a marketing guy or he's an engineering guy?

23        MR. LANDGRAFF:  He's -- I would him a marketing guy.

24        THE COURT:  Okay.

:11:12    25        MR. LANDGRAFF:  He's a marketing guy.

1           THE COURT:  All right.

2           And, so, Alexander Morgan, or Dr. Morgan, he's your

3     technical expert.

4           Who's Gary Gutzler?

:11:22    5           MR. LANDGRAFF:  He's our damages expert.

6           THE COURT:  Okay.

7           And I saw somewhere -- maybe it was in the Pretrial

8     Order -- that the parties agree that damages start when the suit

9     was filed?

:11:34    10          MR. LANDGRAFF:  Correct.

11          THE COURT:  And what is Mr. Gutzler, or Dr. Gutzler, or

12    whatever his title is, what is his opinion as to what the

13    damages are, you know, bottom line number?

14          MR. LANDGRAFF:  The bottom line is, 8.6 million right

:11:49    15    now.  Would we just updated the schedules based on recent sales.

16    He's going to offer primarily a loss profits opinion.

17          THE COURT:  Okay.  All right.

18          So then there's some other people listed in the next

19    section "Called by Deposition," Georges Danker.

:12:17    20          MR. LANDGRAFF:  Mr. Danker is a marketing person at

21    Unifrax who we deposed and who's not on Unifrax's will call

22    witness list.

23          THE COURT:  So is he a 30(b)(6) or 30(b)(1)?

24          MR. LANDGRAFF:  He served in both capacities, so we

:12:34    25    have two depositions from Mr. Danker.

| | | |
|---|---|---|
| | 1 | THE COURT:  Who's Joseph Fernando? |
| | 2 | MR. LANDGRAFF:  He is one of the technical people at |
| | 3 | Unifrax that we deposed who worked on the infringing product. |
| | 4 | THE COURT:  Okay. |
| :12:51 | 5 | Who is Dawn Wilson? |
| | 6 | MR. LANDGRAFF:  She's the 30(b)(6) representative for |
| | 7 | Unifrax on what's loosely called the damages related issues. |
| | 8 | She explained Unifrax's financial information to us. |
| | 9 | THE COURT:  Okay. |
| :13:08 | 10 | I know who Evan Chu is. |
| | 11 | Is it at this point -- does either side expect Mr. Chu |
| | 12 | to show up in person? |
| | 13 | MR. LANDGRAFF:  I don't.  We're not expecting -- we're |
| | 14 | not bringing him in. |
| :13:24 | 15 | MR. HOLDREITH:  It's highly unlikely, your Honor. |
| | 16 | THE COURT:  Okay. |
| | 17 | And I guess I should just ask, at the top of this list |
| | 18 | of will call by deposition, there's something that's called a |
| | 19 | Unifrax pursuant to Federal Rule of Civil Procedure 30(b)(6). |
| :13:47 | 20 | What is that supposed to mean? |
| | 21 | MR. LANDGRAFF:  Those are the 30(b)(6) depositions, so |
| | 22 | that -- that's what -- |
| | 23 | THE COURT:  Oh, you're talking about -- so these are |
| | 24 | just 30(b)(6) depositions in addition to whatever is included by |
| :14:00 | 25 | these four people? |

| | |
|---|---|
| 1 | MR. LANDGRAFF:  Correct.  Those people were all deposed |
| 2 | in their individual capacities.  Some of them served as |
| 3 | corporate representatives as well, so we were making that |
| 4 | distinction. |
| :14:08  5 | THE COURT:  Oh, okay. |
| 6 | And, presumably, you told Unifrax which of these |
| 7 | 30(b)(6) witnesses you're planning -- |
| 8 | MR. LANDGRAFF:  Yes, we -- |
| 9 | THE COURT:  -- to represent? |
| :14:21  10 | MR. LANDGRAFF:  Excuse me.  Yes, we've exchanged |
| 11 | deposition designations. |
| 12 | THE COURT:  All right. |
| 13 | And then there's also a may call list. |
| 14 | There's Bill Pardo who I wrote down, DuPont 30(b)(6). |
| :14:42  15 | I'm not sure how I knew that. |
| 16 | So, basically, you might call this person sort of in |
| 17 | response to whatever it is Unifrax does with its 30(b)(6)? |
| 18 | MR. LANDGRAFF:  Yes, that's right. |
| 19 | THE COURT:  Is that same amount for Tomas Perez? |
| :14:59  20 | MR. LANDGRAFF:  Yes, sir. |
| 21 | THE COURT:  Whose Jian Wang? |
| 22 | MR. LANDGRAFF:  She is one of the technicians that |
| 23 | worked with Drs. Richardson and Kawka on reducing the invention |
| 24 | to practice.  And she's also a named inventor on some |
| :15:15  25 | predecessor patents, parent patents. |

1          THE COURT:  Okay.

2          And then the last group is, may call by deposition, and

3  I see Ken Miller, Robert Rioux, and Jim Olchawski, who I also

4  noticed, I think are all on the will call live for Unifrax list,

:15:41    5  right?

6          MR. LANDGRAFF:  Correct, and that's why they're may

7  call by deposition.

8          THE COURT:  Okay.  So Exhibit 10, Unifrax's witness

9  list.

:15:49    10          Who is Jim Olchawski?

11          MR. HOLDREITH:  Yes, sir, he was the Marketing Manager

12  for the products who's the guy who dealt with Boeing.

13          THE COURT:  Okay.

14          And Chad Garvey I learned is the Lamart -- somebody --

:16:13    15  an engineer or something at Lamart?

16          MR. HOLDREITH:  He is now at Lamart, although he will

17  offer testimony about the time when he was employed at Unifrax

18  and developing products that are at issue in the case.

19          THE COURT:  Okay.

:16:24    20          So he's testifying in both capacities kind of as a

21  present day Lamart person and as a person who has some

22  historical knowledge at Unifrax?

23          MR. HOLDREITH:  Exactly.  He was with Unifrax through

24  most of the development, and towards the very end of the events

:16:40    25  that matter for the trial, he moved over to Lamart.

```
 1                   THE COURT:  All right.

 2                   Who's Robert Rioux?

 3                   MR. HOLDREITH:  He's an engineer at Unifrax who also

 4       worked on the accused product.

 5                   THE COURT:  Ken Miller?

 6                   MR. HOLDREITH:  The same.

 7                   THE COURT:  I know who Evan Chu is.

 8                   Thomas Nosker, expert witness.

 9                   What's he an expert on?

10                   MR. HOLDREITH:  He's a polymer chemist, your Honor.

11                   THE COURT:  Richard Habert, who I've been reading about

12       lately.  Though, I can't say right now.  I know he's a technical

13       expert.

14                   He's kind of an invalidity expert or is he both

15       invalidity and infringement?

16                   MR. HOLDREITH:  He is both.  And he's in composites,

17       and minerals, and ceramics expert, so he can talk about not just

18       polymer chemistry, but how it all comes together in the product.

19                   THE COURT:  All right.

20                   And I take it then that Carl G. Degen, the expert

21       witness is on damages?

22                   MR. HOLDREITH:  Yes, sir.

23                   THE COURT:  So what is Mr. Degen, does he have a

24       damages number that he suggests?

25                   MR. HOLDREITH:  He does.  It's a reasonable royalty and
```

:16:49

:17:03

:17:19

:17:32

:17:43

1    it's about a million bucks, give or take.

2              THE COURT:  All right.

3              Then you've got this list of may call if the need

4    arises.

:18:01    5              Who's Andrew Golian?

6              MR. HOLDREITH:  He was the patent prosecutor on

7    DuPont's patents.  He would be relevant only if there was an

8    inequitable conduct case.

9              THE COURT:  Okay.

:18:13    10              Well, we're not going to try an inequitable conduct

11   case, assuming there is one, next week, so that's probably means

12   he probably won't be testifying then.

13              MR. HOLDREITH:  Right.

14              THE COURT:  Okay.

:18:36    15              And then Fernando is somebody that they've got 30 --

16   they've got -- I'm sorry, earlier you said various people were

17   now going to be here live.

18              Is Mr. Fernando one of them?

19              MR. HOLDREITH:  We are not planning to call him.  We

:18:56    20   contemplate if he were needed for rebuttal after his deposition

21   is played, we might bring him for that purpose.

22              But our live witnesses will be Garvey, Miller, Rioux,

23   and Olchawski.

24              THE COURT:  Okay.

:19:12    25              MR. HOLDREITH:  We just had to pick.  We can only call

1   so many.

2           THE COURT:  Right.

3           And, so, what you just said about Mr. Fernando, sort of

4   applies to Ms. Wilson and Mr. Danker?

:19:22   5           MR. HOLDREITH:  Yes, sir.

6           THE COURT:  All right.

7           So, basically, really the people that you have as may

8   call, if the need arises, it's fair to say that realistically

9   you don't expect to call any of them?

:19:48  10           MR. HOLDREITH:  That's correct, your Honor.  We

11   obviously listed some of DuPont's witnesses who are live, so we

12   expect he testimony is going to be live, but in case they don't

13   testify live for some reason.

14           With respect to our witnesses, there's a small

:20:01  15   possibility they come for rebuttal, but I really don't expect

16   that.  It's highly unlikely.

17           THE COURT:  All right.

18           And, so, DuPont mentioned that Dr. Morgan is only

19   available for a week or -- only available for a week.

:20:13  20           Is there any other witnesses that you expect to have

21   any scheduling problems with?

22           MR. LANDGRAFF:  Not from our side, your Honor.

23           MR. HOLDREITH:  Your Honor, we checked on the week of

24   trial carefully.  We expect that will be the week.  We now

:20:34  25   understand it may move over to the Monday, and I apologize, I

1    have not been able to verify that.

2            THE COURT:  That's all right.

3            You know, these are fluid things, but at least right

4    now you don't anticipate any other?

:20:46    5        MR. HOLDREITH:  No.

6            THE COURT:  And if you, depending on the schedules that

7    we eventually get, if you come up with a problem, you know, I

8    personally am willing to work with you, and I expect -- and I

9    would expect DuPont to do the same.

:21:01   10        MR. HOLDREITH:  Right.

11           THE COURT:  I mean, that goes both ways.

12           All right.

13           In terms of witnesses, is there anything else to talk

14   about right now?

:21:08   15       I've got what I wanted to get.

16           MR. HOLDREITH:  I wanted to just alert the Court, I

17   don't think it's for a decision today, but we do have some

18   objections to the Danker testimony that's been designated.  That

19   depends a little bit on some of the Motion in Limine rulings,

:21:25   20   but it was inflammatory.  He's kind of a rough-spoken guy.  We

21   think a lot of it is being played not because it's relevant, but

22   because DuPont thinks he's not very likeable.

23           I'll reserve that for the Motion in Limine coming up,

24   but I still feel compelled to mention that today.

:21:42   25       THE COURT:  So you're objecting to your own employee?

1          MR. HOLDREITH:  I'm objecting to certain testimony that

2  we think is just not relevant in the case, and it's

3  inflammatory, yes.

4          THE COURT:  Okay.  All right.

:21:53  5          So let's move along here.

6          I skipped over the point -- I forget -- somewhere there

7  was talk of what the outstanding motions are.

8          And I forget, do you remember where that is?

9          (Pause)

:22:17  10          Page 3, okay.

11          So here's the -- on the outstanding motions on Page 3,

12  this is what I'm planning on doing.  Obviously, there will be

13  something in writing next week.

14          But the Summary Judgment of non-infringement or in the

:22:40  15  alternative, invalidity that Unifrax has filed, I expect to deny

16  that.

17          The DuPont Motion for Leave to file an Amended

18  Complaint alleging willful infringement, I expect to deny that.

19          The Summary Judgment on the inventorship defense, I

:23:05  20  expect to deny that.

21          On the unenforceability counterclaim, frankly I'm

22  inclined to just let that ride, because it seems to me that it

23  might easily get resolved without me actually having to do

24  anything.

:23:27  25          So that's where -- so just for planning purposes.

1          So we do also have these Motions in Limine that you

2     filed, which start at, I believe, Exhibit 17?

3          Right.

4          So let me just ask a couple of questions about some of

:23:55   5     these.

6          So the first DuPont motion, which I love the caption,

7     "To Exclude Testimony of Unifrax's Expert That Amount To

8     Argumentative Recitation Of Facts and Lawyer Argument."

9          I guess you would like me to enter an order saying,

:24:16   10    Unifrax, you're not allowed to put on expert testimony that is

11    an argumentative recitation of the facts and is really lawyer

12    argument?

13         MR. LANDGRAFF:  Yes, your Honor, that's what we wanted.

14         Their expert, Dr. Haber, has this long and factual

:24:36   15    narrative, and they should be forced to -- they have to present

16    it through witnesses, and they have to corroborate that

17    testimony.  The law doesn't allow him just to be a mouth piece

18    for the lawyers and --

19         THE COURT:  So isn't it something that -- do I really

:24:53   20    need to see him trying to do whatever it is you want him not to

21    do, and sort of see -- it's hard to just do it in the abstract,

22    it seems to me what you're asking me to do.

23         MR. LANDGRAFF:  Well, we tried to get -- and I

24    understand -- we tried to identify portions of his expert report

:25:13   25    that reflect the sort of mouth piece for lawyer portion.

1        If your Honor wants to wait, we just want to raise it

2    with you, and note that we object to him just being an

3    argumentative mouth piece, which is what his expert report is,

4    you know --

:25:27   5        THE COURT:  But the way that -- you know, I saw some of

6    the quotes from his expert report.  You know, sometimes people

7    write expert reports and that is not actually the way their

8    direct testimony is going to come out.

9        MR. LANDGRAFF:  Fair enough.

:25:58   10       THE COURT:  And, so, when you say that, you know, you

11   think he's going to be a mouth piece -- and I forget exactly

12   what you just said -- but the recitation of facts, if you were

13   him, and you were testifying right now in a way you don't want

14   him to testify, he's going to be saying, Unifrax engineers had

:26:32   15   -- what is the argument on the recitation of facts that you

16   think is improper just as a general category?

17       MR. LANDGRAFF:  When they haven't been introduced.

18       My point is, they need to -- and our point is -- they

19   need to establish these facts and provide some evidence of them.

:26:48   20       Their engineers have a stunning lack of knowledge of

21   what's in their product, but yet he seems to, you know, claim

22   that he knows exactly what's going on in there, and --

23       THE COURT:  Well, I mean, that's his is expertise is to

24   know what's going in there their product.

:27:05   25       MR. LANDGRAFF:  But the issue here goes to timing of

1    development, and things that they need to prove through their

2    own engineers, and their own witnesses, not --

3              THE COURT:  So, if they have, because I presume that

4    he's relying on documents that they've given him that are

:27:22    5    drawings of things, or engineers notes of things, or pictures of

6    things.

7              And, you know, an expert taking these things, and

8    explaining them what they are to a jury or how people would --

9    or what they mean.

:27:48    10             I take it, you're not objecting to that, or you are?

11             MR. LANDGRAFF:  No, sir, we're not objecting to that.

12             THE COURT:  So what is it -- so you expect him to just

13   be what I like to call the omniscient narrator?

14             You know, so here's what happened, blah, blah, in 2008.

:28:05    15   2009, 2010.  Here's a document from 2011.

16             Is that what you think is going to happen?

17             MR. LANDGRAFF:  Yes, and that's what we're asking you

18   to prevent.

19             THE COURT:  All right.  Okay.

:28:17    20             Let me just hear from somebody else on the other side,

21   because I gather that you are saying that that's actually not

22   what he's going to do?

23             MR. PRANGE:  Well, your Honor, I believe it's just a

24   narrow view of what the testimony is that is in Dr. Haber's

:28:35    25   report.  Dr. Haber ought to be able to support his opinions.

1    And there is an invalidity argument that he is making, so the

2    pieces that he has don't --

3            THE COURT:  And the invalidity argument that he is

4    making is -- put it in more concrete terms, how this narrative

:28:51    5    history, or whatever it is, relates to his invalidity arguments?

6            MR. PRANGE:  There is a portion which is the state of

7    the art, and what is the state of the art that is confronted by

8    both the inventors at the time where it would have been the

9    critical date of the patent --

:29:06    10            THE COURT:  But the state of the art, presumably,

11    that's, you know, publications, making working models here and

12    there.

13            I mean, I don't think that's what they're objecting to.

14            MR. PRANGE:  Well, what they point to of the specific

:29:19    15    parts that they raise in their motion, a portion of that

16    addresses what is the state of the art.

17            And one of things that they address, which is in the

18    first report, is the construction of one of the products, which

19    is directly relevant to how that may be modified by a person of

:29:38    20    ordinary skill in the art.  Like the other portions that exist,

21    it's the development history and -- of the product and --

22            THE COURT:  The development history, which I take it is

23    the part that they are objecting to is Dr Haber.  In terms of

24    the development history, is he relying on documents to show the

:30:03    25    development history?

1      MR. PRANGE:  He relies on documents, he relies on

2  testimony, he also uses all that, because that portion also is

3  relevant to what is the state of the art.

4      But also the other important part, too, is he also

:30:16   5  responds to the statements that their own expert makes, which is

6  the beginning point at Paragraph 36 in the reply report.

7      And, so, we think that Dr. Haber should also have the

8  ability to rebut what is being said with respect to the

9  positions that Dr. Morgan is taking.

:30:33  10      THE COURT:  Well, no, I do note that in the Motion in

11  Limine, the bullet points of which there are five, the first

12  four appear in his reply report.  His report does suggest

13  perhaps it's just more objectionable stuff, but, you know, that

14  is -- you know, that does sort of put it in -- presumably that's

:31:03  15  not what you would think is easiest to object to at this point

16  is some kind of anticipated narrative by him, with him showing

17  things in his reply report don't seem necessarily to fit with

18  that go argument.

19      So the development history is relevant to -- I take it

:31:22  20  that's irrelevant to infringement, right?

21      MR. PRANGE:  Well, in terms of how their product --

22  what is in their product, I think the development history is

23  reflective of that --

24      THE COURT:  Well --

:31:34  25      MR. PRANGE:  -- because --

1    THE COURT:  Go ahead.  Sorry, Mr. Prange, you're

2  speaking.  Go ahead.

3    MR. PRANGE:  Well, just to complete my thought.

4    3G11 doesn't -- is really an interim product than the

:31:45   5  3G7, which is where this development history is relevant, and is

6  relevant in speaking about what is active 3G11.

7    THE COURT:  So the question of infringement is, what is

8  3G11, right?

9    MR. HOLDREITH:  It is the question of infringement is

:32:01   10  what is 3G11.  But I think there is the portion about whether

11  this 3G11 is instructive in the development history of what is

12  3G11.

13    THE COURT:  And, in terms of invalidity, how does this

14  development history figure in?

:32:18   15    MR. PRANGE:  It shows all -- really what people of

16  skill in the art were doing at the time.  It is instructive to

17  both the state of the art and the motivation that may be -- that

18  Dr. Haber is going to have to testify about.

19    THE COURT:  Okay.

:32:39   20    Thank you, Mr. Prange.

21    Anything else you wanted to say, Mr. Landgraff?

22    I'm going to take this under advisement.

23    MR. LANDGRAFF:  I just want to point out that this -- I

24  don't know why it wasn't said, but it relates to their 102(g)

:32:52   25  defense, which is in the statements of law.

1            That is, they're trying to say they -- that they

2   invented the products before we reduced our patent to practice,

3   and that's why he can't be the omniscient narrator.

4            I like your term better than mouth piece.

:33:13    5            THE COURT:  All right.

6            MR. PRANGE:  Your Honor, if I may say two other points

7   just briefly?

8            THE COURT:  Yes.

9            MR. PRANGE:  One is that the 397 product, or the 396

:33:22   10   product -- excuse me -- the first product that --

11           THE COURT:  When you say 396 or is it 3G6?

12           MR. PRANGE:  No, there is -- well, there are three

13   products that Unifrax's has commercialized.  The first is 396,

14   the second is 3G7 -- and excuse me -- I'm actually not reading

:33:40   15   my co-counsel's handwriting correctly --

16           THE COURT:  Okay.

17           MR. PRANGE:  And then there's 3G11.

18            The point of 3G11 is that 3G7, the development history,

19   3G7 anticipates, because we believe that that came before when

:33:52   20   the filing date was, so then there it becomes an issue about

21   what is going on.

22           The second point I would like to make simply is that

23   all of this argument that is about what Dr. Haber could testify

24   about, I think this is also really a Daubert Motion, which the

:34:10   25   time for that has passed.  It's also reflected in our cases that

1    --

2           THE COURT:  Well, I don't think it's really is a

3    Daubert Motion, because they are not challenging his

4    methodology.

:34:20    5           What they're really just making is a legal argument

6    that, you know, there is just a certain amount of regurgitation,

7    what fact witnesses would say as though -- as facts.

8           So I don't -- so I don't really see this is a Daubert

9    Motion.

:34:45   10           MR. PRANGE:  Thank you, your Honor.

11           THE COURT:  Okay.

12           Like I said, I'll take that under advisement.

13           THE COURT:  So Unifrax's Motion in Limine No. 1, which

14    is "Precluding DuPont From Presenting Argument Or Evidence Of An

:35:08   15    Embodying Products," I understand they are talking about the

16    Insulfab product which apparently is made by somebody else, or

17    sold by somebody else, I'm not sure which.

18           And, so, the question, I think -- or it seems to me the

19    main question here is -- will DuPont show a nexus between the

:35:35   20    Insulfab, and I guess Claims 1 and 2 of the patent?

21           MS. LAWSON:  Yes, your Honor, there actually two --

22           THE COURT REPORTER:  Your name?

23           MS. LAWSON:  Oh, Alyssa Lawson.

24           In Unifrax's Motion in Limine in No. 1.

:35:47   25           The first is actually that DuPont, itself, doesn't make

1    an embodiment product and has admitted that.

2            But in the litigation, throughout the litigation

3    they've conflated.  The final product, Insulfab 2518, with their

4    component, Nomex XF --

:36:05    5            THE COURT:  But conflation, unless you're using that as

6    a question for cross-examination, if they say, we make it, and

7    you say, no, you don't.

8            MS. NILES:  They were doing it more relative to

9    DuPont's product, so we're trying to limit them to --

:36:16   10            THE COURT:  Well, you know, that seems to me that's

11    just, you know, cross-examination.

12            I mean, the fact that it's not their product, doesn't

13    prevent it from being a commercial -- evidence of commercial

14    success.

:36:29   15            Everything else being satisfied, right?

16            MS. LAWSON:  That's correct.

17            THE COURT:  Okay.

18            SO what about the second point, which I assume is the

19    nexus point?

:36:38   20            MS. LAWSON:  The second point they point to is Insulfab

21    2518 looks for secondary consideration, and they also make a

22    claim for lost profits.

23            And they haven't provided a sufficient disclosure of

24    any kind of analysis or documentation that shows that the

:36:58   25    Insulfab 2518 practices the claims of the patent.

1    Now, we asked Interrogatory No. 12, which they provided

2    a conclusory answer.  They didn't provide any kind of claim

3    analysis, they didn't point to any document support, and then

4    they identified Dr. Richardson, one of the named inventors on

:37:16    5    the '926 patent, to testify in his 30(b)(6) deposition on behalf

6    of DuPont, as to the facts of Interrogatory No. 12.

7    And when asked about it, did not know the components of

8    the commercial embodiment sold by Triumph, including none of the

9    DuPont witnesses who knew what the adhesives were used for,

:37:38    10    because it's a proprietary adhesive by Triumph, and Triumph is

11    not on their witness list.

12    Dr. Richardson pointed to Dr. Kawka as having

13    knowledge, but Dr. Kawka wasn't identified as a 30(b)(6).  And

14    he also said he doesn't know whether or not the process changed,

:37:55    15    once it was qualified, and now sold by Triumph.

16    Their expert as well doesn't provide any analysis, just

17    a conclusory statement that it embodies.  So they haven't

18    disclosed to us any kind of analysis that they would have then

19    disclosed at trial.

:38:13    20    They attached a bunch of documents.  This is the first

21    time they've ever pointed at this document.  And the documents

22    don't show that the claim -- all of the claim limitations.  They

23    haven't done this analysis that the -- pointing to Unifrax

24    documents and testimony on looking at the Insulfab product.

:38:31    25    That is just kind of a red herring.  They point to some

1    testimony of our sales guy, George Danker -- to some documents.

2    Some of them are from communications with a third party and they

3    just don't show a claim analysis.

4         So DuPont just hasn't -- hasn't done this.  They

5    haven't disclosed that the Insulfab 2518, this commercial

6    embodiment, and they should be able to provide that evidence.

7         THE COURT:  Okay.

8         Let me hear from DuPont briefly.

9         MR. LEVINE:  Your Honor, Dr. Kawka has personal

10    knowledge under Rule 602 about how the product is made, what is

11    in the product.  And we provided -- we not only believe he will

12    be able to testify about it, he did testify in his depositions

13    that it practices the claims of the patent, and he went --

14         THE COURT:  How does he have this personal knowledge?

15         MR. LEVINE:  Because he personally -- not only was he

16    involved in developing the process, but he has personally been

17    to Chase now Triumph.  Triumph bought Chase.

18         And witnessed the product as it's being made, knows

19    what goes in it, knows what temperature is used.

20         And, in fact, when Dr. Richardson was asked a question

21    -- this is in the part that Unifrax put as Exhibit G of their

22    motion -- they asked a question to him about the activation

23    temperature that was used.

24         And this is at Page 233 of the deposition.

25         Dr. Richardson said -- it was 135 to 145C -- celsius --

1    and he knew that because Dr. Kawka quote, "has seen the

2    equipment running the commercial product."

3          When asked where in the equipment, where does it show

4    it, et cetera, he said, you have to ask Dr. Kawka.

:40:14    5          They deposed Dr. Kawka after that and didn't ask him.

6    That's not our problem.  It's theirs.

7          But Dr. Kawka is in there.  Dr. Richardson explained

8    that Dr. Kawka has been there, seen the lamination machine being

9    running, they were running --

:40:27   10          THE COURT:  Well, so, Dr. Richardson, isn't he kind of

11    irrelevant to this?  You're saying that Dr. Kawka really

12    testified that he's seen it, and it does this and it does that?

13          MR. LEVINE:  I'm just saying that, yes, Dr. Kawka is

14    going to be the one testifying.

:40:45   15          My point is that in terms of disclosure and notice --

16          THE COURT:  That's what I thought you were doing.  In

17    terms of the way that you are planning to do this at trial, Dr.

18    Kawka is going to describe this manufacturing process based on

19    some personal knowledge?

:41:00   20          MR. LEVINE:  Yeah, it's more than that.  There's

21    documents -- as you know, there are different parts and

22    different limitations.  Some of them like the weight of the

23    material, that's not just seeing it, and knowing it, that's

24    documentation.  We provided some of the documentation on the

:41:17   25    weight and other things.

1          THE COURT:  And is Dr. Morgan going to tie all this

2     together?

3          MR. LEVINE:  It depends on your ruling on the other

4     Motion in Limine.

:41:29    5          But in part, you know, we have him giving an opinion.

6     He did not -- my point is, we just went through Dr Haber and

7     whether he could talk about things in a general sense.

8          You know, Dr. Morgan gave a conclusory opinion.  He did

9     not -- we don't have a whole claim chart on this.  Our plan is

:41:47   10     not for Dr. Morgan to go through any kind of detail.

11          He might say, based on Dr. Kawka, you know, it shows

12     that the limitations here are met.  He testified to that.

13          But the actual testimony about what is found in the

14     Insulfab 2518 product will come from Dr. Kawka, because he is

:42:05   15     involved in developing it and he has personal knowledge.

16          He testified --

17          THE COURT:  So one of the things that Unifrax said in

18     their motion was essentially that Dr. Morgan gave a -- and I'm

19     paraphrasing here -- a conclusory sentence that Insulfab met the

:42:27   20     claims in the patent, or at least the limitations in the claims.

21          Are you essentially conceding that's what he says is

22     too conclusory to actually be used?

23          MR. LEVINE:  We don't plan on having Dr. Morgan

24     testifying about this point.  We're going rely on Dr. Kawka for

:42:51   25     it.

1          THE COURT:  Okay.

2          And you said besides Dr. Kawka, there's documents.

3          MR. LEVINE:  Absolutely.  We attached a number of

4    documents that showed things like --

:43:08    5          THE COURT:  Well, we don't need to go through that

6    right now.

7          But essentially -- and, so, part of what Dr. Kawka, or

8    Dr. Richardson, or both are going to testify about is their

9    inventive process, which is going to result in -- I'm wondering,

:43:40   10    is that process, itself, how close does that get you to Insulfab

11    2518?

12          MR. LEVINE:  So they're work and development efforts

13    led to Insulfab 2518.  Insulfab 2518, they are these -- they're

14    different layers in it.

:43:55   15          One of them, the refractory, inorganic or vermiculite

16    layer, DuPont makes.  It's called Nomex XF 10.

17          THE COURT:  Right, I got that.

18          MR. LEVINE:  The other layers, DuPont recommended what

19    to put in there, and gave certain requirements to the laminator,

:44:14   20    which was Chase now Triumph, and then they do the physical

21    manufacture through the lamination, but using the process that

22    DuPont -- or not -- were using the materials, the ingredients

23    that DuPont put in its patents.

24          And that DuPont has worked with Chase on to say, you

:44:35   25    know, you have to use this stuff.

1          And Dr. Kawka has been there at Chase making sure that

2     they used this stuff.

3          Now, the only thing that the other side points to is,

4     yes, but Dr. Kawka's testimony that they cited in their reply

:44:47    5     was on what the product was when it was qualified, but he said

6     there may have been some deviation.

7          Remember, he's a technical person, so he has a very

8     small change in deviation.  You can't have big deviations,

9     otherwise you have to requalify the product.  This is going in

:45:05   10     the air, you know, there are strict FAA and Boeing standards for

11     what goes in the air, so that's a cross point.

12          The question here is just, is there information to

13     support the idea that there's an embodiment?

14          And Dr. Kawka has personal knowledge of it with

:45:20   15     documents to support it.

16               THE COURT:  All right.

17               Thank you, Mr. Levine.

18               MR. LEVINE:  Thank you, your Honor.

19               THE COURT:  Do you want to say anything further about

:45:28   20     that, Ms. Lawson?

21               MS. LAWSON:  Your Honor, Dr. Morgan has actually

22     provided an opinion specifically on the product that applies to

23     the claims, and offering --

24               THE COURT:  Well, it sounds like he's not going to.

:45:48   25               MS. LAWSON:  After Dr. Kawka offers an expert opinion,

1    it's just improper.

2          THE COURT:  Yeah, I'm not sure -- that's an interesting

3    question whether it is an expert opinion or whether it's just

4    sort of fact testimony from somebody who is a highly qualified

:46:11   5    individual, right?

6          MS. LAWSON:  I mean, it's prejudicial to Unifrax to

7    suggest that they're embodying a product where an expert hasn't

8    done the analysis, and relying on that fact to essentially

9    provide this.

:46:29   10         THE COURT:  Okay.  All right.

11         I think I got the parties positions here.

12         I'll take that under advisement, too.

13         Thank you.

14         So then the third Motion in Limine, the second one by

:46:38   15   the defendant is on copying.

16         And, as I understand it, DuPont has not agreed that

17   copying is not a secondary considerations that is at issue,

18   right?

19         MR. LEVINE:  That's correct.

:47:06   20         THE COURT:  So DuPont, what is the testimony that you

21   think they're trying to exclude and what is the purpose for

22   which you're offering it?

23         MR. LEVINE:  The testimony they are trying to

24   exclude -- you know, it may makes sense.  I prepared a timeline

:47:25   25   --

1          THE COURT:  Okay.

2          MR. LEVINE:  -- that might be helpful to understand the

3    testimony.

4          THE COURT:  Yes, I'm always agreeable to timelines.

:47:40   5          MR. LEVINE:  If I may approach?

6          THE COURT:  Sure.

7          (Pause)

8          MR. LEVINE:  So, first I'm going to first address what

9    the evidence is, and then what it's relevant to.

:48:02   10          What the evidence is, we have to start with --

11    actually, if I may, it may make sense to start with what it's

12    relevant to?

13          THE COURT:  Okay.

14          MR. LEVINE:  As was discussed briefly before, Unifrax

:48:17   15    is relying on this 3G7 work that they did.  And they are relying

16    on it as a prior invention under 102(g), you know, where you

17    look at who conceived of it at first, who reduced it to practice

18    first, and was there diligence.

19          And then you decide, was there a prior invention by

:48:37   20    another?

21          It's different than a product for sale, or a product in

22    public use, or even a patent or publication.

23          So they have to show that they conceived of their

24    patented invention first, and reduced it to practice first,

:48:55   25    though there's some questions about what happens if the one and

1    not the other is -- I'm not going to get into the complications

2    of that today.

3         Second, there is this secondary consideration of

4    obviousness, which is -- usually it's a non-obviousness -- but

:49:11    5    there's one that exists of obviousness that Unifrax says it's

6    relying on which is near simultaneous invention, and they are

7    relying on that work in 3G7 for that.

8         So the relevance of the copying is to show Unifrax

9    says, they had a prior invention under 102(g).

:49:30    10         We say, no, it wasn't a prior invention, they just

11    copied.

12         THE COURT:  I don't understand why -- I mean, two

13    things.

14         One of which is, I'm rather -- I have my doubts when

:49:59    15    you write and say I'm not going to use something as a secondary

16    consideration on nonobviousness, or I'm not going to use

17    copying.  Then you can then say, oh, well, they are going to

18    show a secondary consideration of obviousness and this is

19    related to that.

:50:20    20         That's one thing.

21         But the second thing is, I don't understand, if the

22    question is, who conceived of it and reduced it to practice

23    first, if they're first, they didn't copy, and they are not

24    first, who cares if they copied?

:50:39    25         MR. LEVINE:  Because the documentation with respect to

1  their development is -- you know, the two work together.

2          So we say not only were they second, but the evidence,

3  the same -- many of the same documents show that they were

4  second, and going out and meeting with people like Orcon, who is

:50:59   5  a laminator that we were dealing with, meeting with Triumph, who

6  makes the blanket, meeting with some of the same folks that we

7  deal with.

8          It's a small industry and because of that finding out

9  what other people are doing.  And they're finding out that we're

:51:14  10  working on vermiculite.  You can see going to the timeline that

11  we started working on vermiculite in 2008 actually.  We ended up

12  having a patent relating to it, but not the patent at issue,

13  but a parent patent, the '027 in April 2009.

14          Discussed adhesive bonding with the vermiculite in late

:51:34  15  2009.  Then at this meeting with Boeing did lots and lots of

16  testing leading up to a FAA certified test August 3rd, 2010.

17          And we look -- when we look at the bottom, it was what

18  Unifrax is doing.  We have Mr. Danker who's the marketing guy

19  with the competitive --

:51:56  20          THE COURT:  The marketing guy that they don't want to

21  hear too much from.

22          MR. LEVINE:  Yeah, the marketing guy that we want to

23  play and they don't want us to play.

24          THE COURT:  Sorry to interrupt.

:52:05  25          One of the things when I was reading through the

1    Motions in Limine, it seemed to me that -- it seemed to me what

2    Unifrax is really trying to keep out was the -- what you have

3    here as competitive intelligence gathering, which, you know,

4    sounds like doing something illegal when it's not, right?

:52:33    5    And I'm guessing whether or not there is evidence here

6    that DuPont does it too, right?

7    MR. LEVINE:  It all goes to the nature of the

8    competitive intelligence.

9    And I'm not saying it's illegal.  That's a different --

:52:43    10   that's a whole different level.

11   Competitive intelligence findings out what products are

12   actually in the marketplace, and benchmarking against your

13   competitors, that's normal.  People do that.

14   However, competitive intelligence where you are talking

:52:59    15   to others in the industry to find out what's under development,

16   what are they using, what are he they doing, and to get that

17   information?

18   That's not -- that's not the same as competitive

19   intelligence of products in the marketplace.

:53:13    20   THE COURT:  So, I mean, it sounds like, you know, you

21   -- the way you want to present this is, they're doing something

22   if not illegal, it's dirty?

23   MR. LEVINE:  Well, the way we present it is, they say

24   that they came up with this patented invention first.

:53:34    25   They're relying on 102(g), prior invention by another.

1    In fact, we came up with it first.  And what they have

2    in these 3G7 documents that they are going to show you in the

3    testimony about 3G7 is actually based on this copying effort, or

4    this effort by people to find out information about what others

:53:56    5    are doing, and then use vermiculite months after DuPont starts.

6    THE COURT:  Well, Mr. Levine, I assume -- and I'm not

7    sure what the relevant thing is -- but the relevant date is who

8    reduced it to practice first?

9    MR. LEVINE:  They're both relevant in different ways.

:54:18    10    I need to get the rule out.  They are both relevant.

11    THE COURT:  Yeah, you want it to be conception?

12    MR. LEVINE:  Yes, conception.  Normally conception, but

13    there are different -- what happens if one reduces to practice,

14    what happens if you have a mix and match?

:54:29    15    THE COURT:  But what I'm getting at is, each side is

16    going to present some kind of evidence to show we conceived it

17    on X date, and we reduced it to practice on Y date -- and there

18    may be arguments, you know, about what those dates are -- but

19    how does saying, well, they were asking around and, you know, if

:54:55    20    they got it reduced to practice, what difference would it make

21    if they were asking around and gathering intelligence?

22    MR. LEVINE:  Because it shows that -- not just

23    gathering intelligence, but gathering intelligence about what

24    we're using, and then using it themselves shows that they didn't

:55:11    25    conceive of the invention, they copied or got the invention

1    based on what we were doing.

2          So, they have to show they conceived of it and then

3    reduced it to practice.

4          And we're saying, you didn't come up with it.  You just

:55:26    5    found out what we were doing and then you did something in

6    response.

7          THE COURT:  So this is an argument because -- and I may

8    not be characterizing it right -- they're saying, we had it on X

9    date, and you're going to say -- and then a few months pass and

:55:47   10    then DuPont conceived of it -- and you're going to say then your

11    actual conception date is, you know, some time after that, and

12    your first date is not right.

13          And your second date, which is too late, is only

14    because -- or I don't get it.  I mean, if they had it, and you

:56:13   15    can argue their second, in which case they lose, I guess, but

16    how does copying change?

17          MR. LEVINE:  Because it shows it wasn't their guys who

18    -- their people who filed, you know, because for their work on

19    it, it has to lead to something.

:56:30   20          And here, you know, it led to whatever it is that led

21    to 3G7 and also led to a patent application that they filed.

22          And what we're saying is that the evidence shows that

23    they didn't actually come up with an invention.  It has to be

24    prior invention by another, not prior copying by another.

:56:52   25          And we're saying they didn't come up with the invention

1    on their own.  They found out what we were doing under

2    development and copied parts of that, and then copied more of it

3    as time went on.

4        THE COURT:  And your evidence for copying is what?

:57:07    5        MR. LEVINE:  The evidence for copying -- there are a

6    number of -- it's not just, let's go find out about competitive

7    intelligence.  It's a number of things talking about meetings

8    with -- Orcon meetings with Triumph finding out -- trying to

9    find out about what competitors are doing from them.

:57:22    10        It is -- and we've submitted some of it in the response

11    to the Motions in Limine, but with page limitations we can only

12    do so much, but there is more showing that they met with, when

13    they met with these folks, then you have Mr. Danker reporting to

14    Mr. Olchawski -- I was reading his deposition last night --

:57:43    15    where Mr. Olchawski talks about the documents to him about

16    competitive -- about what we're finding out about competitors, a

17    guy who used to be with Triumph, who then leaves Triumph, and

18    there's documents at Unifrax about paying him, quote, "under the

19    table."

:57:58    20        So there's a lot of suggestion that --

21        THE COURT:  Wait, wait, wait.

22        Paying him under the table?  That's something that you

23    are planning on producing?

24        MR. LEVINE:  Well, the reason was, it was suggested

:58:11    25    that it relates to the micro-link to work on -- you know, market

1   what's going on in the market, so a guy is finding out for them

2   what's going in the market.

3          There's a number of pieces of evidence there.

4          I agree, we do not have the smoking gun to show they

:58:25   5   had the DuPont blueprints there and doing something based on it,

6   but you don't need to have that to show copying in some way.

7          We'll limit it to what's responsive, you know, what is

8   relevant to the 102(g), and near simultaneous invention issues.

9          You know, circumstantial evidence of copying comes in

:58:43   10   all the time, and we're limiting it to that with respect to and

11   in response to their arguments of 102(g), and near simultaneous

12   invention.

13          I just want to briefly address, near simultaneous

14   invention, which is something that they're lying on.  Just

:58:57   15   because we're not relying on secondary -- copying as a secondary

16   indicia of nonobviousness, if they choose to rely on near

17   simultaneous invention as a secondary indicia of obviousness,

18   which is their choice, then copying comes in as a response,

19   because as Dr. Haber explains, his opinion under simultaneous

:59:21   20   invention, that both companies independently came up with

21   solutions to improving the laminate.

22          And our point is, it wasn't independent.  It's a direct

23   response to that.  It wasn't independent near simultaneous

24   invention.  It was copying.

:59:38   25          THE COURT:  All right.

1       Thank you, Mr. Levine.

2       MS. NILES:  Good morning, your Honor.

3       Emily Niles on behalf of Unifrax.

4       With respect to the 102(g) argument, the issue comes

:59:55  5  down to the date that the parties made this invention.

6       DuPont is contending that Unifrax came up with this

7  invention after they did, so copying is irrelevant to the

8  determination of who made the invention first.

9       THE COURT:  So Mr. Levine perhaps wisely kind of

:00:18  10 glossed over conception and reduction to practice maybe in order

11 to understand what you all are arguing about.

12      I have to ask.

13      Who has priority?  What's the rule for who has priority

14 here?

:00:39  15      MS. NILES:  Well, under 102(g), in order to prove there

16 was prior invention that is invalid, the accused infringer must

17 prove that they made the patented product before DuPont did, so

18 --

19      THE COURT:  And the -- made the patent, means reduced

:00:56  20 it to practice --

21      MS. NILES:  Yes.

22      THE COURT:  -- before DuPont did, meaning DuPont

23 reduced it to practice?

24      MS. NICE:  Correct.

:01:03  25      THE COURT:  So this conception has some relevance to

1    this question?

2         MS. NILES:  Well, conception and reduction to practice

3    is necessary to prove the invention date.

4         THE COURT:  Right, but -- but conception could have

:01:18    5    occurred simultaneously with reduction to practice, or it could

6    have occurred before, but it never occurs after, right?

7         MS. NILES:  Correct.

8         THE COURT:  So, if the important dates are the

9    reduction to practice, then I'm having trouble understanding why

:01:35   10    conception actually matters?

11         MS. NILES:  Well, DuPont is contending that they

12    conceived it first and that they reduced to practice first.

13         THE COURT:  Well, right, but if the rule is, whoever

14    reduced to practice first wins, then, you know, talking about

:01:55   15    conception may make the story better, but it's actuality

16    irrelevant, right?

17         MS. NILES:  Conception?

18         THE COURT:  Yes.

19         MS. NILES:  It does comes down to when the party

:02:07   20    reduced to practice and what those competing dates are in the

21    end.

22         THE COURT:  Okay.  Let me just interrupt you for a

23    second.  You can stand there.  Don't go away.

24         Mr. Levine, you skipped over this, recognizing that it

:02:20   25    was too complicated for me, but do you agree with her statement

1   of what the law is?

2          MR. LEVINE:  No, I don't, your Honor.

3          Actually, I have here on Mr. Hagale's phone, 102(g),

4   and it says that you look at whether 102(g)(2) is the relevant

:02:37   5   part.

6          It says -- this is pre-AIA -- but if you look at

7   "whether before such person's invention thereof."

8          Such person being the inventor.  Here being DuPont.

9          Before that, "The invention was made in this country by

:02:51   10   another inventor who had not abandoned, suppressed, or concealed

11   it.  In determining priority of invention, under this

12   subsection, there shall be considered not only the respective

13   dates of conception and reduction to practice of the invention,

14   but also reasonable diligence of one who's first to conceive and

:03:13   15   last to reduce to practice from a time prior to conception by

16   the other."

17          So conception is directly relevant.

18          THE COURT:  So just as a matter of curiosity, there

19   shall be considered -- what -- what do you tell the jury about

:03:28   20   that?

21          I mean, oh, you can consider all this stuff or do I

22   have to give them a rule?

23          MR. LEVINE:  Luckily there has been, you know, a model

24   jury instruction based on 102(g).

:03:38   25          And in Section 5.5 of the final jury instructions,

1    there are two disputed instructions.  It's disputed.  There are

2    different instructions on that.

3         Ours comes from the National Jury Instruction Project.

4    That's a panel that is put together by the Federal Circuit.  I

:03:58    5    think Judge McKelvie --

6         THE COURT:  Yeah, yeah, don't argue the merits of the

7    jury instructions right now.

8         MR. LEVINE:  Okay.

9         But it explains -- it explains, you know, how you

:04:03   10    present it to the jury.  There's a specific instruction in there

11    and it relates -- it involves to both conception and reduction

12    to practice.

13         THE COURT:  Okay.

14         MR. LEVINE:  In fact, the rule I just read to you says

:04:14   15    that both are relevant.

16         THE COURT:  Do you have anything further to say on the

17    law there, Ms. Niles?

18         MS. NILES:  Yes, your Honor.

19         What DuPont is contending in this case is that they

:04:24   20    were not the first to conceive and the first to reduce to

21    practice.

22         So the parties competing reduction to practice phase,

23    are really what the fight is going to come down to factually,

24    and DuPont is contending they did that first before Unifrax did.

:04:40   25         THE COURT:  Okay.

1      So it's kind of a side line there.

2      What else do you have to say about this?

3      MS. NILES:  With respect to the secondary

4   considerations of obviousness, we are intending to present

5   simultaneous invention as a secondary consideration of

6   obviousness in this case.

7      DuPont is simply trying to have a second shot at

8   presenting copying as a secondary consideration.

9      THE COURT:  Well, I mean, if you are telling the jury

10   that it's obviousness, because two different people came up with

11   it at the same time, wouldn't it be relevant if one of those

12   people just copied the other person?

13      MS. NILES:  Well, what would be relevant is, who came

14   up with that?

15      And copying in this case -- I'd like to address what

16   the evidence of copying is DuPont asserting here.

17      THE COURT:  Before we get to that, just in the

18   abstract, if... wouldn't it be relevant if you waited to give

19   someone simultaneous invention if it turned out that one had

20   copied the other?

21      MS. NILES:  Well, if one copied the other, then they

22   didn't invent it.

23      So, in that aspect, I would see it as relevant, but the

24   evidence in this case does not bear that out.

25      THE COURT:  Okay.

1           So, now if you want to talk about the evidence, go

2     ahead.  I'll give you a minute.

3           MS. NILES:  Thank you, your Honor.

4           Copying is a serious charge, and the jury is not tasked

:06:26   5     with determining whether copying occurred or didn't occur in

6     this case.

7           The best evidence that DuPont could cite to in response

8     to our motion was the e-mail from Mr. Danker related to

9     competitive intelligence, and his deposition that related to

:06:40   10    competitive intelligence.

11          And, as we know, companies are looking at their

12    competitors.  They're looking at them wondering what their

13    pricing is.  They're wondering what information about the market

14    is out there with the competitors.

:06:53   15          This is a small market, there were a few players, and

16    there's no evidence that Unifrax had information on a DuPont

17    product that was embodying the patents during this relevant

18    point in time, or that they had information regarding DuPont's

19    patent application in order to copy it.

:07:11   20          THE COURT:  And, so, one thing about copying is, you

21    have to copy the whole thing, right?

22          MS. NILES:  Yes.

23          THE COURT:  I mean, it's not the fact that both

24    products -- I'm assuming, I don't know -- but if the patent says

:07:30   25    vermiculite, assuming it does, and your product has vermiculite

1    in it, assuming it does, and maybe that people back then were

2    saying vermiculite, that's the secret ingredient.

3            That, by itself, proves nothing, right?

4            MS. NILES:  No, your Honor, you must proof that what

:07:48   5    happened with -- if there's copying of a product that embodied

6    the patent, including all three limitations; the vermiculite

7    layer, the primary film layer, or the adhesive layer, and there

8    is no evidence of that in this case.

9            Vermiculite was a well-known mineral at the time.  It

:08:05  10    was used in flame retardant materials.  And it's not --

11            THE COURT:  But even if, you know, Mr. Danker went to

12    Orcon and they said, do you see what I saw in DuPont's product,

13    it's vermiculite?

14            Guys, let's look at vermiculite.

:08:29  15            That's not copying, right?

16            MS. NILES:  That's not copying and there isn't evidence

17    of that happening in this case.

18            THE COURT:  Right.

19            Do you agree with Ms. Niles that that's not copying?

:08:38  20            MR. LEVINE:  No, sir, I don't agree, and here's why.

21            I think your statement of law is absolutely correct

22    with respect to a secondary indicia of nonobviousness.

23            However, here we're not offering it for that purpose.

24    We're offering it to show there was an independent development

:08:58  25    at the same time, as Dr. Haber says in his -- and we hear they

1   are going to say about near simultaneous invention.  And there

2   wasn't a prior invention by another, because the key attributes

3   of it came learning what DuPont was doing.

4       So I think that what you're saying legally is

:09:16   5   absolutely right on secondary indicia, if we were relying on it

6   affirmatively, but since we're relying on it in a different way

7   in response to their points, it is simply to undercut their

8   points.

9       And what they have to show is an independent -- a near

:09:33   10   simultaneous invention or prior invention, not copying for

11   secondary indicia for us.

12       THE COURT:  All right.

13       Do you have anything further, Ms. Niles?

14       MS. NILES:  Your Honor, we'd request that the Court

:09:44   15   preclude DuPont from presenting argument or evidence of copying.

16   It's unsubstantiated in this case and not relevant to the issues

17   to be presented at trial.

18       THE COURT:  If I exclude the evidence about competitive

19   intelligence gathering, Mr. Levine, would that knock out your

:10:10   20   ability to present this?

21       MR. LEVINE:  It would, your Honor.  There is -- they

22   certainly elicited it on examination of our witnesses, and

23   examination of their own witnesses, that doing just general

24   competitive intelligence to see what's out there in the

:10:25   25   marketplace, see what the products are in the market is normal,

1    it's fine.  I don't have a problem with that.

2         But what they want to do is exclude an entire argument

3    that rebuts what two of their points are all together instead of

4    just really goes to the weight and not the admissibility, and

:10:43    5    they can elicit that testimony.  We may elicit testimony from

6    our people that it's normal to find out what's in the market and

7    how that's different in finding out what is under development.

8         THE COURT:  Okay.

9         I'm not entirely sure what I'm going to do here, but it

:11:10    10   does seem to me that there's at least a risk with testimony

11   about competitive intelligence gathering will be  prejudicial,

12   and perhaps unfairly prejudicial, perhaps substantially

13   outweighed by whatever probative value it has.

14        I'm going to think about that, okay?

:11:47    15        MR. LEVINE:  Thank you, your Honor.

16        MS. NILES:  Thank you, your Honor.

17        THE COURT:  All right.

18        So that's the Motions in Limine.

19        I don't think I have anything more tabbed in the

:12:00    20   Pretrial Order.

21        One of the things -- and I didn't really have a chance

22   to look at the voir dire -- but I take it the voir dire that is

23   said to be joint proposed voir dire, both sides are satisfied

24   that it's sufficient to ferret out any members of the panel who

:12:51    25   might have some feelings about DuPont that you all ought to know

1    about.

2           MR. HOLDREITH:  We were happy to be able to agree on

3    the voir dire, your Honor.  We would be content with it as

4    written.

:13:07    5           MR. LANDGRAFF:  We plagiarized your previous voir dire

6    and added a few questions relating to the specifics of this

7    case, your Honor.

8           MR. HOLDREITH:  And we agreed.

9           THE COURT:  Okay.  All right.

:13:20   10           Well, that was -- you know, when I was thinking about

11    this, you know, there is probably quite a few people in Delaware

12    who are very happy or unhappy with DuPont.

13           But, you know, we do ask.  I mean, I do see some

14    questions here, so I may cut out one or two of them.

:13:58   15           (Pause)

16           Actually, they really do look like they pretty much

17    track what I've done before.  And the questions I would formally

18    -- actually, the only question that I was even concerned about

19    is polymer chemistry, but the chances of more than two people

:14:12   20    answering yes to that is pretty minimal, so I think that's no

21    problem.

22           I would expect to give this -- you know, I'm going to

23    read it more closely, but presumptively I'm going to do what you

24    asked me to do, because I do appreciate that you have agreed to

:14:34   25    this.

1          The preliminary jury instructions, you said there were

2     some objections on that, is that right?

3          MR. HOLDREITH:  Yes, they are minor, your Honor.

4          Ms. Niles is going to address those for us.

:14:49    5          THE COURT:  Just remind me of where they are in this

6     tab?

7          MR. HOLDREITH:  Tab F, your Honor, Page 15 -- oh, boy.

8     Pardon me.  It's in the Pretrial Order, Section 8.

9          THE COURT:  Section 8.

:15:08   10          MR. LEVINE:  It's Tab 13, your Honor.

11          MR. HOLDREITH:  Tab 13.  Sorry about that, your Honor.

12          (Pause)

13          MS. NILES:  Your Honor, there are two disputes between

14     the parties on the preliminary instructions.

:15:28   15          And the first one is Instruction 1.8, Burdens of Proof,

16     which is on Page 11 of the preliminary jury instructions.

17          THE COURT:  Yeah, so I'm not real inclined to give

18     things explaining why things don't apply in this case.

19          So this is all about not telling them about what a

:15:49   20     criminal case requires, I'm inclined to go what I've done

21     before.

22          I forget who's objecting here.

23          You're objecting?

24          MS. NILES:  Yes, your Honor, and we have proposed

:16:03   25     simply two sentences at the end of our alternative instruction

1    indicating that the entire burden of proof in criminal cases

2    does not apply, and because that's something the jury is likely

3    to be aware of, and hear of on TV, the burden of proof they're

4    mostly familiar with, we would like an instruction that says

:16:21    5    that doesn't apply in this case.

6          THE COURT:  All right.

7          I'm probably going to not grant that request.

8          What's the other objection?

9          So the deposition is something that's on Page 16, so

:16:28    10   I'm not going to give that as a preliminary instruction, or

11   anything about depositions.

12         As I said earlier, what I like to do is to give

13   something when it first comes up in testimony, so the jury --

14   you know, if I give something on Monday morning saying this, and

:16:52    15   the first time the deposition is on is on Tuesday, even with

16   extremely alert and tentative jury, half of them are going to

17   forget this.

18         MS. NILES:  We have no objection to that procedure,

19   your Honor.

:17:05    20         THE COURT:  And I think I asked earlier -- so I said

21   earlier that I thought you were going to try to propose

22   something about if there's any special thing I need to tell

23   30(b) -- about 30(b)(6), right?

24         MS. NILES:  Yes.

:17:29    25         THE COURT:  Is there anything else in here?

1   MS. NILES:  One more issue at Instruction 1.12,

2   description of the trial proceedings.

3   THE COURT:  Yes.

4   MS. NILES:  Unifrax has an objection to the playing of

:17:40   5   the patent video.  We have modified our position slightly in

6   that, we would be amenable to playing the video where certain

7   portions are excluded.

8   THE COURT:  What portion do you want to have excluded?

9   The only portion -- by the way, I think some of the

:17:52   10   attorneys here have said the part where Judge Fogel says, I'm a

11   United States District Judge.  I would like that to be excluded.

12   I would like it to be the Director of the Office of Courts or

13   whatever it is.  It's been a problem before when people thought

14   what he was saying was the law.

:18:15   15   So, in any event, what is it that you object to?  What

16   do you object to with it?

17   I've seen it a couple of times.  It seems to be fair

18   and balanced.

19   MS. NILES:  That was one piece that we would object to,

:18:27   20   your Honor.  We would also like to continue meeting and

21   conferring with counsel, to see if there's any other portions in

22   the video that are unnecessary and indicate that --

23   THE COURT:  Well, okay.  I have no objection to you

24   doing that.  That's pretty good.

:18:42   25   The final jury instructions, and the verdict form, you

1    know, we'll talk about that some time in the middle or later

2    part of the trial.  You know, usually many of the objections

3    that you have at this point get worked out.

4              MR. LANDGRAFF:  Yes, your Honor.

:19:01    5         May I briefly address the video?

6              THE COURT:  Yes.

7              MR. LANDGRAFF:  They haven't said what they want to

8    exclude.

9              THE COURT:  Well, they just said she would like to

:19:11   10    meet-and-confer over it.

11             MR. LANDGRAFF:  Our position is that we think the whole

12    video should be played.

13             THE COURT:  Why don't you meet-and-confer.  Maybe --

14    you never know -- so meet-and-confer.  And if you didn't work

:19:28   15    that out, get back to me some time late next week.

16             MR. LANDGRAFF:  Okay.

17             THE COURT:  Okay?

18             All right.

19             So other than -- the only other thing -- okay.

:19:50   20        So why don't you all tell me how much time you think

21    you want to do your openings, direct examinations, cross-

22    examinations, everything but the closings, starting with DuPont?

23             MR. LANDGRAFF:  Your Honor, we were guessing around

24    twelve hours per side based on your schedule.  This is where I

:20:22   25    think you asked us to table the discussion of what may happen on

1    Tuesday of our trial week.

2              THE COURT:  Right.  So 12 hours.

3              So Mr. Holdreith?

4              MR. HOLDREITH:  Your Honor, yes, sir.

:20:31    5              I've conferred with Mr. Landgraff.  I think 12 hours is

6    about right.  We'll still be working pretty hard and it might

7    depend a little bit on whether we have satellite links about

8    copying some of these issues to help us streamline it.

9              THE COURT:  Okay.  Hold on.  Let me just -- and, so,

:20:52    10   there are two scenarios here, I think, one of which is, I have

11   promised the trial next week that they could do closing

12   arguments on Tuesday morning of your week.

13             And, basically, what I would anticipate is that if that

14   occurs is that we would have the jury come in for, essentially,

:21:19    15   an afternoon, you know, if I get a verdict, I can take the

16   verdict, but that, you know, we could essentially start at 1:00

17   o'clock and probably get in pretty close to four hours.

18             And I expect that we could probably get in about -- we

19   might get in three-and-a-half to four hours on Monday.  Let's

:21:54    20   assume that's eight hours.

21             You're talking about 24 total.  It leaves 16.  With six

22   a day, so we finish late on Friday.

23             I believe it's the case that the trial that I have the

24   following week is for sure going away.

:22:12    25             So what I would propose is that, assuming the trial

1    next week starts on Monday morning, which you all would know

2    about, that we work on the proposition that all the testimony

3    will be presented during the week, and we will do closing

4    arguments on Monday morning?

:22:33    5         That will give us time to work on the jury instructions

6    and other things in a fairly orderly fashion and give you a

7    chance to rest up for closing arguments.

8              MR. HOLDREITH:  That sounds like a good plan, your

9    Honor.

:22:43    10             MR. LANDGRAFF:  Thank you, your Honor.

11             THE COURT:  So just -- if it turns out that I don't

12    need the -- I mean, I'll know in the next, certainly by Monday

13    morning -- if it turns out that I don't need the closing

14    arguments on the Tuesday, it seems to me with the amount of time

:23:07    15    that you've asked for, one could reasonably expect that you

16    finish up early Friday.

17             Is that something where -- would you want to be

18    planning that you do closing arguments on Monday anyhow, or is

19    it something where you want to do them, you know, starting an

:23:33    20    hour after whenever we finish the testimony?

21             MR. HOLDREITH:  I'd love to give the case to the jury

22    on Friday.  I'm happy to close on Friday, if time permits.

23             MR. LANDGRAFF:  Either way, your Honor.

24             We would just like to know as soon as we can, but --

:23:48    25             THE COURT:  Yeah, well, so would I.

1    MR. LANDGRAFF:  I know you would, too.

2    THE COURT:  Okay.  Listen, you know, I'm not entirely

3  sure what's happening with the other trial, but if we start on

4  Monday morning, then we will be using the time that I've

:24:08    5  reserved on your Tuesday.

6    So, if that's the case, then closings would be Monday.

7    Let me ask you this.

8    How -- I take it -- you know, so I think we'll know by

9  Monday morning.  You can plan accordingly.  If I start the other

:25:06   10  trial on Monday morning, closings will be on Monday.  If I don't

11  start the other trial on Monday morning, plan for closings on

12  Friday, okay?

13    MR. LANDGRAFF:  And just to be -- and that means we

14  start it whether or not it goes away in the middle?

:25:21   15    THE COURT:  I never have any luck that they go away in

16  the middle.

17    MR. LANDGRAFF:  Thank you.

18    THE COURT:  I mean -- and the other thing is, once you

19  start, you know, I don't feel good about having the schedule

:25:38   20  up-in-the-air, but once we know what is happening with the other

21  case, I think we ought to, you know, if they start, if something

22  happens, unless you both come to me and say, we can make it work

23  to do the closings on Friday, I'm not going to change things.

24    But if you both want to change things, it's perfectly

:26:01   25  good with me, but I'm not going to -- you know, people get

1    expectations, and I think you both have plenty of lawyers and

2    can adjust to things, but I don't want to make you do any

3    adjustments that are -- unless you both want to do them, okay?

4              MR. LANDGRAFF:  Thank you.

:26:18      5              MR. HOLDREITH:  Yes.

6              THE COURT:  All right.

7              And, so, just as you know, the general practice is that

8    other than on this Tuesday, the trial runs from 9:30 to 5:00,

9    lunch is for an hour, there will be a break in the morning and

:26:38     10    the afternoon, which I try to make halfway through when I --

11    halfway.

12             Something that -- particularly in the morning when I'm

13    often trying to stretch the testimony blocked closer to two

14    hours, because I prefer to have longer mornings and shorter

:27:04     15    afternoons, but if you get to a point where you're doing the

16    examination of someone, and you know it's a good breaking point,

17    and you think you've done enough, so I won't be worried that

18    we're going to have a long afternoon, you know, you can feel

19    free to suggest, would this be a good time to take whatever is

:27:23     20    next.

21             Otherwise, I'll just use my own judgment when I get to

22    some place, or I think we're -- but, you know, I usually try to,

23    based on cues that I hear from the way you're asking questions,

24    if I think you're going to change topics or something, I may

:27:41     25    call it at that time, okay?

1          MR. HOLDREITH:  Yes.

2          MR. LANDGRAFF:  Yes.

3          THE COURT:  All right.

4          I don't know whether there is anything else that I left

:27:47    5   off that I should be discussing.

6          But why don't -- what do you have that you'd like to

7   raise?

8          MR. LANDGRAFF:  Sure.

9          Your Honor, with the other trial going on the week

:28:06   10   before, what is your preferred practice for our setup?

11          THE COURT:  You can you talk to my Courtroom Deputy.

12          MR. LANDGRAFF:  Okay.  Thank you.

13          And then with respect to exhibits, do you prefer to

14   have a whole set before trial or would you like them after?

:28:25   15          THE COURT:  No -- well, if you mean, personally, no.

16   If you mean the Courtroom Deputy, I think probably.

17          Hold on.

18          (Pause)

19          No.

:28:39   20          MR. LANDGRAFF:  We'll work with the Courtroom Deputy,

21   okay?

22          THE COURT:  Okay.

23          MR. LEVINE:  Your Honor, I have a couple others real

24   quick.

:28:47   25          What's your practice when you're telling the witnesses

1     when they're on breaks and direct?

2             Different judges do different things.

3             THE COURT:  I think when you're on direct, you can talk

4     to them.

:28:56    5             MR. LEVINE:  Okay.

6             The second question, for exhibits, we're exchanging

7     direct exhibits ahead of time, and if there are issues or

8     objections, I think we'll raise them with you that morning?

9             THE COURT:  Right, right.  I forgot to say, you know,

:29:11   10     other than possibly Tuesday, you know, I will be on the bench at

11     9:00 a.m. to see what problems you have.

12             And if you have problems, we will spend up to a half an

13     hour resolving problems.  You know, in the cases that I remember

14     fondly, once a day or two go by and the lawyers try to resolve

:29:31   15     the problems themselves.

16             And I would come out at 9:00 a.m. and say, Good

17     morning.

18             And they'd say, we have no problems.

19             And I'd go back and have more coffee.

:29:37   20             But if you have problems, I think it's best that we try

21     to resolve them outside the presence of the jury.

22             MR. LEVINE:  Sure.  Then with respect to exhibits that

23     we know are going to be admitted, there won't be objections.

24             Is it your practice that we admit them as we go in

:29:53   25     direct, or should we do them at the end?

1        THE COURT:  I think it's good to do them as you go,

2   because then you have this thing at the end where people are

3   moving a slew of things, and nobody knows what they're moving,

4   so I would rather you move them as you go along.

:30:07    5        And particularly, I think -- I don't know whether you

6   all have the convention of having things that are JTX, or JX, or

7   some that are joint, presumably I would like to have the

8   understanding that if there is J -- there's a J -- you say, move

9   to admit.  I say, admitted without objection without bother to

:30:30   10   ask the other side.

11        If they have a P or D in front of them, I always look

12   at the other side.

13        MR. HOLDREITH:  We agree, your Honor.  It makes sense.

14        MR. LEVINE:  My last thing is, any special procedure on

:30:42   15   approaching the witness on either direct or cross?

16        THE COURT:  You know, what I'd like is, the first time

17   you approach, just ask me, may I permit, or may I approach the

18   witness, and I will say, yes and then just approach the witness.

19        The way I was taught you say, may I approach the

:31:02   20   witness freely?

21        And then I say, yes.

22        But, you know, unless there is some kind of bad blood

23   where, you know, there's a risk of a fist-a-cuffs, if you

24   approach of the witness, you know, I'm pretty easy on that.

:31:24   25        MR. LEVINE:  All right.

1        That's you I have, your Honor.

2        THE COURT:  Mr. Holdreith?

3        MR. HOLDREITH:  Yes, thank you, your Honor, just a

4    couple of details.

:31:29   5        I just wanted to advise the Court -- I think it's your

6    practice -- but we plan to provide witness binders with the

7    papers to --

8        THE COURT:  It seems to be everybody's practice.

9        MR. LEVINE:  It is.

:31:37   10       MR. HOLDREITH:  My intention was -- and I'll confer

11   with counsel -- but I think we can provide a screen that's just

12   for the jurors.

13       We would expect the first, for documents not on the

14   joint list, to get them admitted through the witness without

:31:52   15   publishing them to the jury.

16       And then once they're admitted, we'll seek leave to

17   publish them.

18       Is that consistent with your practice, your Honor?

19       THE COURT:  Yes.  And, you know, you all know -- I

:32:08   20   mean, a lot of these exhibits -- I mean, you know, I would

21   expect you to know in advance as to what you actually object to

22   on the other side --

23       MR. HOLDREITH:  We have a process for that.

24       THE COURT:  -- so if you ask the witness, do you

:32:25   25   recognize this?

| | |
|---|---|
| 1 | Yes. |
| 2 | What is it? |
| 3 | It's X. |
| 4 | You know, that's enough. |
| :32:29   5 | MR. HOLDREITH:  Okay.  Perfect. |
| 6 | And we do have a process to -- we'll have our |
| 7 | objections lined up before, and we'll each know, I think, except |
| 8 | perhaps for cross exhibits. |
| 9 | Are you planning to seat eight jurors, your Honor? |
| :32:38   10 | THE COURT:  Yes. |
| 11 | MR. HOLDREITH:  And I wanted to call to the Court's |
| 12 | attention that there is in the Pretrial Order a note. |
| 13 | I'm not sure that we're totally aligned between counsel |
| 14 | on two of the claim constructions.  I think these are issues |
| :33:05   15 | that go to infringement. |
| 16 | But I just wanted to raises it here while we're all |
| 17 | here outside the presence of the jury. |
| 18 | THE COURT:  Okay. |
| 19 | MR. HOLDREITH:  The first term is the 100 percent |
| :33:15   20 | platelet term.  I'm sure the Court is not surprised. |
| 21 | I believe that DuPont thinks that term should be |
| 22 | interpreted to mean that you have to provide mechanical support, |
| 23 | that your carrier only counts as a carrier if it provides |
| 24 | mechanical support. |
| :33:29   25 | We don't think so.  I'm happy to have the experts |

explain that to the jury, but I wanted to acknowledge that

that's a dispute, and advise the Court, of course, if the Court

is concerned that that's a claim construction issue that

shouldn't be.

:33:42          THE COURT:  Well, to me a lot of times whether or not

something is a claim construction issue, depends on how you ask

the experts a question.

        If you ask this question, what does this term mean?

        You made a claim construction issue.

:33:56          If you asked it, does X meet the Court's claim

construction versus, oh, yes, I worship the Court's claim

construction, and it meets it because it does X, Y, and Z.

        That's not claim construction.

        MR. HOLDREITH:  I'm content to try this issue to the

:34:13  jury.  I just wanted to make sure that nobody feels that we're

trampling on the Court's construction.

        THE COURT:  Well, it's hard for me to tell in the

abstract, but if you think you have a claim construction

dispute, I would much rather know about it now than Monday

:34:27  morning a week from now.

        MR. HOLDREITH:  Okay.

        THE COURT:  Or not necessarily right now, but, you

know, early next week.

        MR. HOLDREITH:  And that was my intention.

:34:35          The other one, just so the Court knows, is this

1   adhesive layer used as an adhesive capable of activation at a

2   certain temperature.

3          Our expert will be testifying that an adhesive meets

4   that limitation only if it is activated at, or above that

:34:52   5   temperature, and not sticky below that temperature.

6          I think DuPont's expert will testify that it meets that

7   limitation as long as it works above that temperature.  It

8   doesn't matter what happens below the temperature.

9          And I'm content to try that issue to the jury as well.

:35:06   10   I just wanted to let the Court know.

11          THE COURT:  You have to rephrase that one for me to

12   actually understand what the dispute is.

13          MR. HOLDREITH:  Sure.

14          So the claim limitation that the adhesive is --

:35:18   15          THE COURT:  Capable.

16          MR. HOLDREITH:  -- capable of activation within a

17   temperature range of 75 to 200 degrees Celsius.

18          THE COURT:  Okay.

19          MR. HOLDREITH:  The difference is, our are expert says

:35:29   20   that means below the temperature -- -

21          THE COURT:  Yeah, yeah, so your expert shouldn't be

22   saying that means.

23          MR. HOLDREITH:  I understand.

24          THE COURT:  But you're being colloquial.

:35:36   25          MR. HOLDREITH:  I'm explaining to the Court what our

1    position is.

2         That if the adhesive works below 75, it doesn't meet

3    that claim limitation.  It has to work only above 75.

4         THE COURT:  Is it a comprising claim?

5         MR. HOLDREITH:  Not that particular limitation, your

6    Honor.  The limitation is simply capable of activation within.

7         So that's the operative term, capable of activation.

8         THE COURT:  So your expert is going to say it's capable

9    of activation below that temperature, and your expert is going

10   to say it's also capable of activation within that temperature

11   range?

12        MR. HOLDREITH:  The dispute will be for adhesives that

13   work below 75 degrees.  Our expert says that's not capable of

14   activation at or above 75.  It's activating below that

15   temperature.

16        THE COURT:  Well, are they saying it does not activate

17   above 75 or it's not capable of activating above 75?

18        MR. HOLDREITH:  Let me make sure I'm being as clear as

19   I can.

20        What it boils down to is, there are pressure sensitive

21   adhesives that work at room temperature.  You don't have to heat

22   them up.

23        Our expert says that's not an adhesive capable of

24   activation working above 75.  It only works below 75.

25        Their expert says -- you know, the relevant question

1    is, did the adhesive work above 75?

2            It doesn't matter what happens below 75.

3            THE COURT:  Yeah, that sounds like a little bit of a

4    claim construction dispute.

:37:07    5            MR. HOLDREITH:  It does turn on how you understand the

6    word "activation" and how you understand the term, "capable of

7    activation."

8            THE COURT:  All right.

9            Well, you should talk to each other.  I'm happy to deal

:37:22    10   with claim construction next week.

11           I will be very unhappy to deal with it the following

12   week.

13           MR. HOLDREITH:  And that was my thinking, your Honor.

14   I wanted to make sure I brought it up.

:37:31    15           MR. LEVINE:  Your Honor, may I briefly address the

16   claim construction point?

17           THE COURT:  Sure.

18           MR. LEVINE:  Because I think the first one is actually

19   a question of construing the construction.

:37:40    20           The issue is the term, the claim term, was a hundred

21   percent by weight.

22           And your Honor construed it to say -- not using the

23   exact words -- that dispersants don't count, but the carriers do

24   count.

:37:53    25           THE COURT:  Right.

1      MR. LEVINE:  But, naturally, when you have that, the

2  question that will come to an expert is, what's a carrier?  Is

3  this thing that's in there a carrier or not?

4      So there are differences about whether something is a

:38:05      5  carrier, but I think that's a fact issue, it's not --

6      THE COURT:  And phrased like that, I think it's a fact

7  issue.

8      MR. LEVINE:  The other issue, you know, basically we're

9  saying, "capable of", means its plain and ordinary meaning.

:38:18     10      Can it be activated there?

11      It doesn't have to be.  It doesn't say, having an

12  activation temperature.

13      It says, capable of.

14      So, if the other side wants to raise it, we can address

:38:28     15  it, but, our position as you know is that capable of is not

16  something that has a special meaning in this patent.

17      Their expert, by the way, Dr. Nosker, admitted directly

18  in his deposition.

19      There was a direct question.  The same question you

:38:45     20  asked.

21      Is the adhesive capable of activation in that range, 75

22  to 200?

23      His answer was, yes.

24      THE COURT:  Okay.

:38:56     25      MR. LEVINE:  That's all I have, your Honor.

1          THE COURT:  Okay.

2          Well, you all talk to each other and think about it.

3    If one of you thinks you have a conclusion dispute, then you

4    have a claim construction dispute, I think, or at least it's

:39:09    5    something that you should bring to my attention.

6          All right.

7          Mr. Holdreith, anything else you want to bring up?

8          MR. HOLDREITH:  One very minor point, your Honor.

9          When we get to the Rule 50 Motions, do you prefer to

:39:20    10   have those raised verbally immediately or save them for the end

11   of day?

12         THE COURT:  I prefer to save them for some other time.

13         You know, realistically, if anybody on either side is

14   betting on them being granted, that is an argument that you

:39:40    15   should not make, right?

16         MR. HOLDREITH:  Understood.

17         THE COURT:  As far as I'm concerned, you know,

18   basically if they say they rest -- DuPont says they rest, you

19   know as far as I'm concerned, as long at the first opportunity

:40:01    20   when the jury is not here to say, yes, we have some motions to

21   make, as far as I'm concerned, that is preserving your motions.

22         And, in fact, I probably will, if you want to make them

23   orally, I can do that.  If you want to make them in writing, I

24   can do that, too.  Whatever works for you.

:40:23    25         Fortunately, I almost never have to send the jury out

1    in the middle of the blocked time, because whatever -- so, I've

2    answered your question?

3            MR. HOLDREITH:  Yes, sir.  Maybe well get lucky and

4    we'll have a Rule 50 Motion, but I was merely asking if I could

:40:42    5    preserve on this.

6            And my suggestion to the Court would be, we're happy to

7    just submit a paper record at the end of the day, or next day,

8    if there is not a lot of time.

9            THE COURT:  Okay.

:40:55    10           Well, I think the way, you know, when the jury is gone,

11    say whatever it is that you are going to do.

12           So you don't have to do it right then, but do at least

13    put it on the record then if you are going to be doing

14    something, okay?

:41:11    15           MR. HOLDREITH:  That's great, your Honor.

16           Thank you.

17           THE COURT:  All right.

18           Anything else?

19           MR. LEVINE:  No, sir.

:41:16    20           MR. HOLDREITH:  No, your Honor.

21           THE COURT:  Thank you for your time this morning.

22           We'll try on these various things to get stuff in

23    writing to you, but depending on what I'm actually doing next

24    week, that may be hard.

:41:34    25           We'll see what we can do, okay?

1        So I'm looking forward to seeing you in ten days.

2        MR. LANDGRAFF:   Thank you, your Honor.

3        MR. LEVINE:   Thank you very much, your Honor.

4        (The proceedings adjourned at 10:41 o'clock a.m.)

:41:43    5                    *   *   *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25